## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SHARON NIXON-CRENSHAW, Derivatively on Behalf of DYCOM INDUSTRIES, INC., | Civil Action No: |
| Plaintiff, | **VERIFIED SHAREHOLDER AMENDED DERIVATIVE COMPLAINT** |
| vs. | |
| STEPHEN C. COLEY, DWIGHT B. DUKE, EITAN GERTEL, ANDERS GUSTAFSSON, PATRICIA L. HIGGINS, STEVEN E. NIELSON, PETER T. PRUITT, JR., RICHARD K. SYKES, LAURIE J. THOMSEN, CHARLES B. COE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| DYCOM INDUSTRIES, INC., | |
| Nominal Defendant. | |

Plaintiff Sharon Nixon-Crenshaw ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Dycom Industries, Inc. ("Dycom" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Dycom with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

1

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Dycom against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from November 20, 2017 through the present (the "Relevant Period") and have caused substantial harm to Dycom.

## JURSIDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Dycom maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Dycom, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

5.      *Plaintiff Sharon Nixon-Crenshaw* ("Plaintiff") is a current owner of Dycom stock and has held the stock during the time of Defendants' continuous wrongful course of

conduct alleged herein.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

6.      ***Nominal Defendant*** Dycom is incorporated in Florida and maintains its principal offices located at 11780 US Highway 1, Suite 600, Palm Beach Gardens, FL 33408.  Dycom's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DY."

**Present Director Defendants**

7.      ***Defendant Stephen C. Coley*** ("Coley") has served as a member of the Board since 2003.  As stated in the Company's Form DEF 14A filed with the SEC on April 12, 2018 (the "2018 Proxy Statement"), Coley is Dycom's Lead Non-Management Director, Chairman of its Corporate Governance Committee, and a member of its Audit Committee and Executive Committee.  As of April 2, 2018, Defendant Coley beneficially owned 97,000 shares of the Company common stock.

8.      ***Defendant Dwight B. Duke*** ("Duke") has served as a member of the Board since 2011.  As stated in the Company's 2018 Proxy Statement, Duke is Chairman of Dycom's Compensation Committee and is a member of its Corporate Governance Committee.  As of April 2, 2018, Defendant Duke beneficially owned 28,038 shares of the Company common stock.

9.      ***Defendant Eitan Gertel*** ("Gertel") has served as a member of the Board since 2016.  As stated in the Company's 2018 Proxy Statement, Gertel is a member of Dycom's Audit Committee, Compensation Committee, and Finance Committee.  As of April 2, 2018, Defendant Gertel beneficially owned 2,108 shares of the Company common stock.

10.      ***Defendant Anders Gustafsson*** ("Gustafsson") has served as a member of the Board since 2013.  As stated in the Company's 2018 Proxy Statement, Gustafsson is a member of Dycom's Corporate Governance Committee, Executive Committee, and Finance Committee. As of April 2, 2018, Defendant Gustafsson beneficially owned 12,223 shares of the Company common stock.

11.      **Defendant Patricia L. Higgins** ("Higgins") has served as a member of the Board since 2008.  As stated in the Company's 2018 Proxy Statement, Higgins is Chairperson of Dycom's Audit Committee, and is a member of its Corporate Governance Committee and Finance Committee.  As of April 2, 2018, Defendant Higgins beneficially owned 41,053 shares of the Company common stock.

12.      **Defendant Steven E. Nielson** ("Nielson") has served as a member of the Board since 1996 and is its Chairman of the Board.  As stated in the Company's 2018 Proxy Statement, "Mr. Nielsen has been the President and Chief Executive Officer of the Company since March 1999; President and Chief Operating Officer from August 1996 to March 1999; and Vice President from February 1996 to August 1996."  As also stated in the Company's 2018 Proxy Statement, Nielson is the Chairman of Dycom's Executive Committee.  As of April 2, 2018, Defendant Nielson beneficially owned 1,016,985 shares of the Company common stock, which represented 3.26% of its outstanding shares on that date.

13.      **Defendant Peter T. Pruitt, Jr.** ("Pruitt") has served as a member of the Board since his appointment effective on November 19, 2018.  As stated in Dycom's Form 8-K filed with the SEC on November 20, 2018, "[t]he Board of Directors has not made a determination as to whether Mr. Pruitt will be named to any committees of the Board of Directors."  Dycom also represents in this Form 8-k that "Mr. Pruitt is not a party to any arrangement or understanding regarding his appointment as an officer and does not have any family relationship with any of the Company's executive officers or directors.  Mr. Pruitt is not a party to any transaction with the Company that would be required to be disclosed pursuant to Item 404(a) of Regulation S-K."

14.      **Defendant Richard K. Sykes** ("Sykes") has served as a member of the Board since 2018.  As stated in Dycom's 2018 Proxy Statement, "Mr. Sykes was appointed to the Board of Directors of the Company in March 2018, for a term to last until the Company's 2018 Annual Meeting of Shareholders."

15.      **Defendant Laurie J. Thomsen** ("Thomsen") has served as a member of the Board since 2015.  As stated in the Company's 2018 Proxy Statement, Thomsen is the Chairperson of Dycom's Finance Committee, and is a member of its Audit Committee and Compensation

4

Committee.  As of April 2, 2018, Defendant Thomsen beneficially owned 3,466 shares of the Company common stock.

**Former Director Defendant**

16.     ***Defendant Charles B. Coe*** ("Coe") served as a member of the Board until November 21, 2017.  As stated in the Company's Form DEF 14A filed with the SEC on April 12, 2018 (the "2017 Proxy Statement"), "Charles B. Coe, a director whose term also expires at the Annual Meeting, has reached the mandatory retirement age for Board members under the Company's Amended and Restated By-laws and will therefore be deemed to have resigned at the expiration of his current term."  As also stated in the Company's 2017 Proxy Statement, Coe was the Chairman of Dycom's Finance Committee, and was a member of its Audit Committee and Compensation Committee.

17.     Defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielson, Pruitt, Sykes, and Thomsen are herein referred to as the "Present Director Defendants".  The Present Director Defendants together with Defendant Coe are herein collectively referred to as the "Director Defendants".

## DYCOM'S CORPORATE GOVERNANCE

18.     As members of Dycom's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

19.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dycom, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

20.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Dycom, the Director Defendants owed Dycom and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control

5

and manage Dycom in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of Dycom and its investors.

21. Each director of the Company owes to Dycom and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

22. To discharge their duties, the officers and directors of Dycom were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Dycom were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how Dycom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices,

make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

23.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dycom, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

24.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, Dycom has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**BACKGOUND AND DEFENDANTS FALSE AND MISLEADING STATEMENTS**

25.     Dycom provides specialty contracting services through subsidiaries throughout the United States and in Canada.  Dycom's services include program management, engineering, construction, maintenance, and installation services for telecommunications providers, underground facility locating services for various utilities, including telecommunications providers, and other construction and maintenance services for electric and gas utilities.

26.     On November 20, 2017 Dycom issued a press release announcing the Company's financial and operating results for the first fiscal quarter ended October 28, 2017 ("Q1 2018 Press Release").  This press release was also attached as an exhibit to Dycom's Form 8-K filed with the SEC on the same date.  In this press release, the Company stated in relevant part:

Palm Beach Gardens, Florida, November 20, 2017 - Dycom Industries, Inc. (NYSE: DY) announced today its results for the fiscal quarter ended October 28, 2017. This announcement is one day earlier than previously scheduled and the conference call to review the Company's results is now scheduled for Monday, November 20, 2017 at 9:00 a.m. (ET). Specific dial-in and replay information appears below.

The schedule change is a result of the Company's preliminary determination that certain documents containing financial information were subject to unauthorized access after the market closed on Friday, November 17, 2017. The Company's investigation is ongoing and law enforcement authorities have been notified.

•     Contract revenues of $756.2 million for the quarter ended October 28, 2017, compared to $799.2 million for the quarter ended October 29, 2016. Contract revenues for the quarter ended October 28, 2017 decreased 8.4% on an organic basis after excluding $8.6 million of contract revenues from an acquired business that was not owned during the prior year quarter and $15.5 million of contract revenues from storm restoration services in the current period.

•     Non-GAAP Adjusted EBITDA of $97.6 million, or 12.9% of contract revenues, for the quarter ended October 28, 2017, compared to $129.2 million, or 16.2% of contract revenues, for the quarter ended October 29, 2016.

•     On a GAAP basis, net income was $28.8 million, or $0.90 per common share diluted, for the quarter ended October 28, 2017, compared to net income of $51.0 million, or $1.59 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income was $31.6 million, or $0.99 per common share diluted, for the quarter ended October 28, 2017, compared to Non-GAAP Adjusted Net Income of $53.7 million, or $1.67 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income for the quarters ended October 28, 2017 and October 29, 2016 excludes $4.5 million and $4.3 million, respectively, of pre-tax interest expense incurred for non-cash amortization of the debt discount associated with the Company's 0.75% convertible senior notes due September 2021.

Net income and Non-GAAP Adjusted Net Income for the quarter ended October 28, 2017 include an income tax benefit of approximately $0.9 million for the tax effects of certain share-based award activities as a result of the Company's adoption of Accounting Standards Update No. 2016-09, Compensation – Stock

Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting ("ASU 2016-09"). This tax benefit would have been recorded to additional paid-in-capital under the previous accounting standard.

The Company also announced its outlook for the fiscal quarter ending January 27, 2018. The Company currently expects total contract revenues for the fiscal quarter ending January 27, 2018 to range from $645 million to $675 million. On a GAAP basis, diluted earnings per common share for the fiscal quarter ending January 27, 2018 is expected to range from $0.15 to $0.27. Non-GAAP Adjusted Diluted Earnings per Common Share is expected to range from $0.24 to $0.36. Non-GAAP Adjusted Diluted Earnings per Common Share guidance excludes $4.6 million of pre-tax interest expense for non-cash amortization of debt discount, or $0.09 per common share diluted on an after-tax basis. A reconciliation of Non-GAAP Adjusted Diluted Earnings per Common Share guidance provided for the fiscal quarter ending January 27, 2018, along with reconciliations of other Non-GAAP measures, is included within the press release tables.

27.    During a conference call discussing the Company's financial and operating results for the first fiscal quarter ended October 28, 2017 ("Q1 2018 Conf. Call"), Nielsen stated in relevant part:

Revenue was $756.2 million, a decrease of 5.4%. Organic revenue, excluding $15.5 million of storm restoration services in the quarter declined 8.4%. This quarter reflected an increase in demand from three key customers as we deployed 1 gigabit wireline networks and grew core market share, offset by near-term moderation by a large customer. Gross margins were 20.55% of revenue, reflecting solid operating performance, offset by the impacts of the decline in revenue. General and administrative expenses were 8.54%.

\* \* \*

*Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018. Customers are continuing to reveal with specificity new multi-year initiatives that are being planned and managed on a market-by-market basis.*

Our ability to provide integrated planning, engineering and design, procurement and construction and maintenance services is of particular value to several industry participants.

[Emphasis added]

28.    Regarding the timing of the permitting for the new large projects, Nielsen stated in relevant part:

As with prior initiations of large-scale network deployments, we expect some normal timing volatility and customer spending modulations as network deployment strategies evolve and tactical considerations, primarily permitting impact timing.

29.     During the Q&A session of that call, an analyst inquired about permitting. Nielsen immediately assured investors of the speed of the permitting process.   In this exchange, each party stated in relevant part:

*Stifel, Nicolaus & Company, Incorporated, Research Division - VP and Analyst*

Okay great, thanks. And then second, you've mentioned some permitting hold ups, is this just a function of the scale of some of these capital plans that your customers -- **or is there something else specific going on?**

**Steven E. Nielsen** - *Dycom Industries, Inc. - Chairman, President & CEO*

No. It's exactly your point, Noelle, is that when you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. **It is not anything unusual, and unlike other adjacent spaces where you have larger projects, these are typically local municipal permits, they're not federal permits. We're not talking about environmental studies or other types of permitting**. And, in fact, just recently, the FCC passed a rule that actually will speed around small cells, some of the permitting by removing some local reviews that were already occurring.  So I think it'll get better, it always does.  But at this stage in these projects, it's always something to watch. [Emphasis added].

30.     During the call, Nielsen also disclosed an increase in headcount from 13,236 for the fiscal quarter ended January 28, 2017 to 14,393.  During the Q&A session of the call, an analyst asked about the reasons for this headcount increase.  In this exchange, each party stated in relevant part:

*Wells Fargo Securities, LLC, Research Division - MD and Senior Analyst*

Two, if I may. Just on the, excuse me, employee count, it did go up a bit, which seems surprising. I mean, I assume that's just part of the absorption comments that you feel very comfortable hiring more heads, given the line of sight you see coming down the pike. I just wanted to confirm that.

* * *

**Steven E. Nielsen** - *Dycom Industries, Inc. - Chairman, President & CEO*

Sure. ***So with respect to the employee count, as we've talked about on the last call, we certainly are adding engineers, planners, designers, project managers. We're setting up warehouse locations to support these new project initiations. And the core business, is busy. I mean you look at the housing numbers, there are other things that are driving that headcount, but we're getting ready. Well, we're not getting ready, we're doing the engineering work we need to get started***. [Emphasis added].

31.     Regarding the impact of the new large projects on the gross margin, Dycom's Senior Vice President and Chief Financial Officer ("CFO") H. Andrew DeFerrari ("DeFerrari") stated in relevant part:

> We expect gross margin percentage to be in line or slightly better compared to the April 2017 quarterly margin, reflecting the expected mix of work activity and improving performance as services for large customer programs begin to accelerate.

32.     During the Q&A session of the call and responding to a question about gross margin guidance, Defendant Nielsen stated in relevant part:

> *Thompson, Davis & Company, Inc., Research Division - Director of Research*

> Steve, I wanted to stay with the April guidance. You've guided to gross margins flat to up, year-over-year. I'm just curious, what gives you the confidence that gross margins will get back to flat, given the fact there will still be early in some of these large programs?

**Steven E. Nielsen** - *Dycom Industries, Inc. - Chairman, President & CEO*

So Adam, if you remember, Drew's comments and Drew can amplify on this, are talking about absorption, right? ***We are incurring some costs in the January quarter that we think we get the benefit of as revenue returns, at least in line and possibly growth***. [Emphasis added].

33.     On this news, the price of the Company's common stock increased $12.82 over the course of three trading days from a close on November 17, 2017 at $90.04 per share of Dycom common stock, to a close on November 22, 2017 at $102.86 per share of Dycom common stock, a rise of approximately 14.24%.

11

34.     The statements in paragraphs above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Director Defendants or recklessly disregarded by them.  Specifically, the Director Defendants failed to disclose that: (i) Dycom's large projects were highly dependent on permitting and tactical considerations, (ii) Dycom was facing great uncertainties related to permitting issues; (iii) said uncertainties would expose Dycom to near-term margin pressure and absorption issues, and (iv) as a result of the foregoing, Defendants' statements about Dycom's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

### THE TRUTH BEGINS TO EMERGE

35.     On May 22, 2018, the Company issued a press release announcing the Company's financial and operating results for the first fiscal quarter ended April 28, 2018 ("Q1 2019 Press Release") and revising the guidance for the fiscal year 2019.  This press release was also attached as an exhibit to Dycom's Form 8-K filed with the SEC on the same date.  In this press release, the Company stated in relevant part:

**Outlook**

The Company is revising its financial guidance for the 2019 fiscal year ending January 26, 2019 to reflect the actual results for the quarter ended April 28, 2018 and the anticipated timing of activity on large customer programs and the related impacts on revenues and margins. The Company's previous guidance and its current expectations for fiscal 2019 are as follows:

|  | Previous Guidance Fiscal 2019* | Revised Guidance Fiscal 2019 |
| --- | --- | --- |
| Contract revenues | $3.30 - $3.50 billion | $3.23 - $3.43 billion |
| Diluted Earnings per Common Share - GAAP | $4.78 - $5.70 | $3.81 - $4.70 |

| | | |
|---|---|---|
| Non-GAAP Adjusted Diluted Earnings per Common Share | $5.22 - $6.14 | $4.26 - $5.15 |
| Non-GAAP Adjusted EBITDA % of revenue | 13.6% - 14.1% | 12.4% - 12.9% |

*       For a reconciliation of the prior Fiscal 2019 Diluted Earnings per Common Share guidance to the prior Non-GAAP Adjusted Diluted Earnings per Common Share guidance and a reconciliation of the prior Fiscal 2019 Net income guidance to the prior Non-GAAP Adjusted.

36.       During a conference call to discuss the Company's financial and operating results for the first fiscal quarter ended April 28, 2018 ("Q1 2019 Conf. Call"), the Company's CFO, DeFerrari, stated in relevant part:

Adjusted EBITDA was $73.7 million in Q1 2019, which was at 10.1% of revenue. Gross margins were at 18% and compared to the April quarter last year were impacted by prolonged winter weather conditions and costs incurred on large customer programs.

Gross margins were approximately 100 basis points below our expectations for the quarter. *This margin pressure resulted from the under-absorption of labor and field costs as large customer programs mobilized. We expect margins to continue to be impacted in the near term with the pressure dissipating as we gain greater momentum on these large programs.* Accordingly, our outlook has been lowered for the full fiscal year from our prior expectations to reflect the expected margin pressure.  [Emphasis added].

37.       During the Q&A session of the call, an analyst inquired about the disappointing margins.  Nielsen then disclosed that the Company did not have enough work in hand to absorb the costs it had already incurred associated with the large projects mainly because Dycom was facing great uncertainties related to permitting issues. In this exchange, each party stated in relevant part:

*Analyst, Stephens, Inc.*
So, Steve, obviously, *the big question on everyone's mind this morning is the pressure on margin and a little more specifics around what's causing it.* And it sounds like you're still expecting a big ramp in the business. The timing has maybe changed a little bit. But I think what we're all trying to get at is a little more specific around the near-term margin pressure and do you believe you can still get this business back to a mid-teens EBITDA margin once things ramp up and you're better absorbing those costs.

**Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*

So, to the second question, Matt, yes. I mean, we have not changed our view on mid-teens EBITDA. With respect to the pressure on the business, we have a number of large programs, some of which require extensive permitting and other governmental authorities. While we've been through this before, the timing of when you build up a cadence in that process that will allow you to efficiently deploy resources, it's hard to forecast. I mean, we understand that and we're disappointed that we didn't get it as right as we would have liked last quarter. But that doesn't change that the projects are there, that we're confident in our ability to execute. ***We've just got to get enough work in hand so that we can both absorb the fixed cost around warehousing and supervision and general management as well as be efficient in the field as we get more permitted backlog that we can really go to work on***. And it's getting better every day. It's just not getting better as quickly as we would have hoped 91 days ago.

*Analyst, Stephens, Inc.*

So, ***is this customer shifting the timing of work or is it simply the permitting process***?

**Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*

We're all working together with our customers, with the permitting authorities. These are large programs. ***In fact, I think they are substantial programs and that means there is a substantial buildup in activities from the permitting authorities and it's taking a little time, but it's getting better***. [Emphasis added].

38.     Later during the call, Nielsen further disclosed full knowledge of these uncertainties and its impact on permitting issues because they were "always around starting the process." Nielsen added that the Company "had similar experiences with large programs 15 years ago" and was "still at them."

39.     On this news, the price of the Company's common stock declined $23.56 from a close on May 21, 2018 at $116.20 per share of Dycom common stock, to a close on May 22, 2018 at $92.64 per share of Dycom common stock, a drop of approximately 20.27%.

40.     On August 13, 2018 before the market open, Dycom issued a press release revising the Company's guidance for the financial and operating results for the second fiscal quarter and six months ended July 28, 2018 and announcing preliminary revenues and results for

the second quarter below the previous guidance ("Q2 2019 Guidance Press Release").  This press release was also attached as an exhibit to Dycom's Form 8-K filed with the SEC on the same date.

41.     During a conference call to discuss the preliminary results ("Q2 2019 Guidance Conf. Call"), Nielsen stated relevant part:

**Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*

This morning, we reported preliminary results for the second quarter that were below our prior expectations. Revenue is expected to be approximately $799.5 million with Adjusted Diluted Earnings per Share, expected to range from a $1.05 to $1.08. This range includes approximately $0.9 million of incremental tax benefits. ***These preliminary results were impacted by large scale deployments that were slower than expected during the quarter, due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs to the lower revenue level***.  [Emphasis added].

42.     When asked during the Q&A session of the call about permitting and absorption issues, Nielsen disclosed that the large projects were not ramping-up as expected due to uncertainties related to permitting issues and that Dycom's core business was in reality not as busy as previously disclosed. In this exchange, each party stated in relevant part:

*Analyst, B. Riley FBR, Inc.*
Steve, your comment with regards to tactical considerations primarily permitting, can you expand upon that just a little bit as it relates to how this tactical consideration due to permitting maybe is different than maybe past FiOS builds or fiber builds in the mid-2000s?

**Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*

Yeah, I think Alex as we said in May, these are big programs, they're ramping up broadly, ***they're subject to greater uncertainties and those are the uncertainties that impacted the second quarter***. I mean they will resolve, but there are uncertainties because of the size of the programs.

*Analyst, B. Riley FBR, Inc.*

And then as it relates to cost pressures in the short-term, can you expand upon that a little bit too? And maybe address sort of your thinking on head count in the

short-term, do you carry head count in anticipation of the big backlog and how that could come through next year? Just a little bit more detail would be helpful?

**Steven E. Nielsen**, *Chairman, President & Chief Executive Officer, Dycom Industries, Inc.*

Sure. So, I think as we said in the comments, it's really an absorption question. I mean *we have to have the staff in place to support the revenue that's embedded in the guidance and we do, but we're not as busy as we had expected to be and so that created an absorption question*. But because the work is there we have to have the people.  [Emphasis added].

43.     On this news, the price of the Company's common stock declined $21.62 from a close on August 10, 2018 at $89.71 per share of Dycom common stock, to a close on August 13, 2018 at $68.09 per share of Dycom common stock, a drop of approximately 24.10%.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

44.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

45.     Plaintiff will adequately and fairly represent the interests of Dycom in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

46.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

47.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants (except Defendant Pruitt, who joined the Board in November 2018).  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

48.     The Company Board is currently comprised of nine (9) members – Coley, Duke, Gertel, Gustafsson, Higgins, Nielson, Pruitt, Sykes, and Thomsen.  Thus, Plaintiff is required to

show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

49.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

50.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

51.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

52.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

53.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

### The Director Defendants Are Not Independent or Disinterested

**Defendant Nielson**

54.     Defendant Nielson is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all his income from his employment with Dycom, making him not

independent.  As such, Defendant Nielson cannot independently consider any demand to sue herself for breaching his fiduciary duties to Dycom, because that would expose him to liability and threaten his livelihood.

55.     Defendant Nielson is also a defendant in the securities class action complaint entitled *Tung v. Dycom Industries, Inc., et al.*, Case 9:18-cv-81448-RLR (S.D. Fla.) ("Securities Class Action").

56.     Further, Dycom acknowledged that Nielson is not independent in its 2018 Proxy Statement.

**Defendants Coley, Gertel, Higgins, and Thomsen**

57.     During the Relevant Period, Defendants Coley, Gertel, Higgins, and Thomsen served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing Dycom's financial statements, Management's Discussion and Analysis, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

58.     Defendants Coley, Gertel, Higgins, and Thomsen breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  Therefore, Defendants Coley, Gertel, Higgins, and Thomsen face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**COUNT I**

**Against the Director Defendants for Breach of Fiduciary Duty**

59.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

61.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

62.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

63.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

64.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Director Defendants for Waste of Corporate Assets

65.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

66.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

67.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its

executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

68.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

69.     Plaintiff, on behalf of Dycom, has no adequate remedy at law.

### COUNT IV
### Against the Director Defendants for Violations of Section 10(b)
### of the Exchange Act and SEC Rule 10b-5

70.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

71.     During the Relevant Period, the Director Defendants disseminated or approved public statements that misrepresented or failed to disclose that (a) Dycom's large projects were highly dependent on permitting and tactical considerations, (b) Dycom was facing great uncertainties related to permitting issues; and (c) said uncertainties would expose Dycom to near-term margin pressure and absorption issues. Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

72.     As such, the Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

     (a)     employed devices, schemes, and artifices to defraud; and

     (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

### COUNT V

### Against the Director Defendants
### for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.     SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.   Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose (a) Dycom's large projects were highly dependent on permitting and tactical considerations, (b) Dycom was facing great uncertainties related to permitting issues; (c) said uncertainties would expose Dycom to near-term margin pressure and absorption issues.; and (d) that as a result, the Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Relevant Period.

76.     In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxy were materially false and misleading.

77.     The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.   The Proxy was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

78.     The Company was damaged as a result of these defendants' material misrepresentations and omissions in the Proxy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing the Director Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 17, 2018

**LAW OFFICES OF SCOTT EGLESTON, P.A.**

By: */s/ Scott D. Egleston*
    Scott D. Egleston
152 N.E.167th Street, Suite 300
Miami, Florida 33162
Telephone: (305) 892-8088
Facsimile: (305) 675-3730
Email: scott@eglestonlegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*