# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SHARON NIXON-CRENSHAW, Derivatively on Behalf of DYCOM INDUSTRIES, INC.,

Case No. 1:18-cv-25289- SINGHAL

Plaintiff,

vs.

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

STEPHEN C. COLEY, DWIGHT B. DUKE, EITAN GERTEL, ANDERS GUSTAFSSON, PATRICIA L. HIGGINS, STEVEN E. NIELSEN, PETER T. PRUITT, JR., RICHARD K. SYKES, LAURIE J. THOMSEN, and CHARLES B. COE,

Defendants,

and

DYCOM INDUSTRIES, INC.,

Nominal Defendant.

---

TERRY WHITE and CHRIS PERKINS, Derivatively on Behalf of Nominal Defendant DYCOM INDUSTRIES, INC.,

Case No. 1:20-cv-21952-SINGHAL

Plaintiffs,

v.

STEVEN E. NIELSEN, H. ANDREW DEFERRARI, DWIGHT B. DUKE, EITAN GERTEL, ANDERS GUSTAFSSON, PATRICIA L. HIGGINS, RICHARD K. SYKES, LAURIE J. THOMSEN, CHARLES B. COE, and STEPHEN C. COLEY,

Defendants,

and

DYCOM INDUSTRIES, INC.,

Nominal Defendant.

---

1

Plaintiffs Sharon Nixon-Crenshaw, Terry White and Chris Perkins ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Dycom Industries, Inc. ("Dycom" or the "Company"), submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Dycom with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Dycom against certain of its officers and directors seeking to remedy Director Defendants' (defined below) violations of state and federal law that have occurred from November 20, 2017 through the present (the "Relevant Period") and have caused substantial harm to the Company.

## JURSIDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the

exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Director Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Dycom, occurred in this District; and (iv) Director Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiffs**

5.      ***Plaintiff Sharon Nixon-Crenshaw*** ("Plaintiff Nixon-Crenshaw") purchased her Dycom stock in or about 2000 and has held her stock continuously since.  Plaintiff Nixon-Crenshaw holds her Dycom stock at the time of the filing of this complaint and plans to hold her Dycom stock throughout the duration of this action.  Plaintiff Nixon-Crenshaw will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

6.      ***Plaintiff Terry White*** ("Plaintiff White") purchased his Dycom stock in August 2017 and has held his stock continuously since.  Plaintiff White holds his Dycom stock at the time of the filing of this complaint and plans to hold his Dycom stock throughout the duration of this action.  Plaintiff White will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

7.      **Plaintiff Chris Perkins** ("Plaintiff Perkins") purchased his Dycom stock in October 2016 and has held his stock continuously since.  Plaintiff Perkins holds his Dycom stock at the time of the filing of this complaint and plans to hold his Dycom stock throughout the duration of this action.  Plaintiff Perkins will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

8.      Nominal Defendant Dycom is incorporated in Florida and maintains its principal offices located at 11780 US Highway 1, Suite 600, Palm Beach Gardens, FL 33408.  Dycom's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DY."

**Director Defendants**

9.      **Defendant Stephen C. Coley** ("Coley") has served as a member of the Board since 2003.  As stated in the Company's Form DEF 14A filed with the SEC on April 12, 2018 (the "2018 Proxy Statement"), Defendant Coley is the Company's Lead Non-Management Director, Chairman of its Corporate Governance Committee, and a member of its Audit Committee and Executive Committee.

10.      **Defendant Dwight B. Duke** ("Duke") has served as a member of the Board since 2011.  As stated in the Company's 2018 Proxy Statement, Defendant Duke is Chairman of the Company's Compensation Committee and is a member of its Corporate Governance Committee.

11.      **Defendant Eitan Gertel** ("Gertel") has served as a member of the Board since 2016.  As stated in the Company's 2018 Proxy Statement, Defendant Gertel is a member of the Company's Audit Committee, Compensation Committee, and Finance Committee.

12.     **Defendant Anders Gustafsson** ("Gustafsson") has served as a member of the Board since 2013.  As stated in the Company's 2018 Proxy Statement, Defendant Gustafsson is a member of the Company's Corporate Governance Committee, Executive Committee, and Finance Committee.

13.     **Defendant Patricia L. Higgins** ("Higgins") has served as a member of the Board since 2008.   As stated in the Company's 2018 Proxy Statement, Defendant Higgins is Chairperson of the Company's Audit Committee, and is a member of its Corporate Governance Committee and Finance Committee.

14.     **Defendant Steven E. Nielsen** ("Nielsen") has served as a member of the Board since 1996 and is its Chairman of the Board.  As stated in the Company's 2018 Proxy Statement, "Mr. Nielsen has been the President and Chief Executive Officer of the Company since March 1999; President and Chief Operating Officer from August 1996 to March 1999; and Vice President from February 1996 to August 1996."  As also stated in the Company's 2018 Proxy Statement, Nielsen is the Chairman of the Company's Executive Committee.

15.     **Defendant Peter T. Pruitt, Jr.** ("Pruitt") has served as a member of the Board since his appointment effective on November 19, 2018.  As stated in the Company's Form 8-K filed with the SEC on November 20, 2018: "[t]he Board of Directors has not made a determination as to whether Mr. Pruitt will be named to any committees of the Board of Directors."

16.     **Defendant Richard K. Sykes** ("Sykes") has served as a member of the Board since 2018.  As stated in the Company's 2018 Proxy Statement: "Mr. Sykes was appointed to the Board of Directors of the Company in March 2018, for a term to last until the Company's 2018 Annual Meeting of Shareholders."

17.     **Defendant Laurie J. Thomsen** ("Thomsen") has served as a member of the Board since 2015.  As stated in the Company's 2018 Proxy Statement, Defendant Thomsen is the Chairperson of the Company's Finance Committee and is a member of its Audit Committee and Compensation Committee.

**Former Director Defendant**

18.     **Defendant Charles B. Coe** ("Coe") served as a member of the Board until November 21, 2017.  As stated in the Company's Form DEF 14A filed with the SEC on April 12, 2018 (the "2017 Proxy Statement"), Defendant "Coe, a director whose term also expires at the Annual Meeting, has reached the mandatory retirement age for Board members under the Company's Amended and Restated By-laws and will therefore be deemed to have resigned at the expiration of his current term."  As also stated in the Company's 2017 Proxy Statement, Defendant Coe was the Chairman of Dycom's Finance Committee, and was a member of its Audit Committee and Compensation Committee.

19.     Defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, Pruitt, Sykes, and Thomsen are herein referred to as the "Present Director Defendants."

20.     The Present Director Defendants together with Defendant Coe are herein collectively referred to as the "Director Defendants."

## DYCOM'S CORPORATE GOVERNANCE

21.     As members of Dycom's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

22.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dycom, the absence of

good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

23.      By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Dycom, the Director Defendants owed Dycom and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage Dycom in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Dycom and its investors.

24.      Each director of the Company owes to Dycom and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

25.      To discharge their duties, the officers and directors of Dycom were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Dycom were required to, among other things:

        (a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and

disseminating truthful and accurate statements to the SEC and the investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how Dycom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

26.      Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith,

and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dycom, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

27.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company. As a result, Dycom has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## STATEMENT OF FACTS

### A.     Background

28.     The Company provides specialty contracting services throughout the United States and Canada, with the vast majority of revenue generated from services within the United States.

29.     The Company provides: (i) program management, engineering, construction, maintenance, and installation services for telecommunications providers; (ii) underground facility locating services for various utilities, including telecommunications providers; and (iii) other construction and maintenance services for electric gas utilities. In connection with these services, the Company provides the labor, tools, and equipment necessary to design, engineer, locate, maintain, expand, install, and upgrade its customers' telecommunications infrastructure.

30.     *Engineering Services*: The Company's engineering services include the design of aerial, underground, and buried fiber optic, copper, and coaxial cable systems that extend from the telephone company central office, or cable operator headend, to the consumer's home or business.  Before it can provide engineering services, the Company must obtain rights of way and permits to support its engineering activities and those of its customers from the appropriate authorities. Once the project is complete, Dycom further provides construction management and inspection personnel in conjunction with engineering services or on a standalone basis.

31.     *Construction, Maintenance, and Installation Services*: The Company's construction, maintenance and installation services include the placement and splicing of fiber, copper, and coaxial cables.  The Company excavates trenches in which to place cables; places related structures such as poles, anchors, conduits, manholes, cabinets, and closures; places drop lines from main distribution lines to the consumer's home or business; and maintains and removes these facilities.  The Company provides these services to both telephone companies and cable multiple system operators in connection with the deployment, expansion, or maintenance of new and existing networks.  The Company further provides tower construction, lines, and antenna installation; foundation and equipment pad construction for wireless carriers; and equipment installation and material fabrication and site testing services.  In order to construct or install these lines, Dycom is required to obtain permits from the appropriate authorities.

32.     *Construction and Maintenance Services for Electric and Gas Utilities*:  The Company also provides underground facility locating services for a variety of utility companies, including telecommunications providers.  The Company's underground facility locating services include locating telephone, cable television, power, water, sewer, and gas lines.

**B.**      **The Majority of the Company's Revenue is Generated by Seven of its Subsidiaries**

33.      The Company has achieved its growth mainly through the acquisition of small to medium sized companies that perform services nationwide. Prior to being acquired, these companies operated as local independent companies servicing small clients on local projects.

34.      The Company operates forty (40) acquired subsidiaries located throughout the United States.  The Company's subsidiaries vary in size and revenue, ranging from less than ten employees or under $5 million in revenue, to 5,000 employees or $500 million in yearly revenue.

35.      The Company's seven largest subsidiaries, which comprise 60% of the Company's annual revenue, are:

- **Ansco & Associates** ("Ansco"), located in GA (headquarters), NC, SC, FL, KY, TX, AL, and MS;

- **Broadband Express, LLC** ("Broadband"), located in OH (headquarters), NY, MI, PA, WV;

- **Ervin Cable Construction LLC** ("Ervin"), located in KY (headquarters), MO, IL, TN, AL, NC, OK, TX, AR, and IN;

- **Star Construction LLC** ("Star"), located in TN (headquarters), AL, GA, IN, KY, LA, MS, MO, OH, SC, and VA;

- **Utiliquest, LLC** ("Utiliquest"), located in GA (headquarters), VA, OH, CA, DE, MD, NC, NJ, IN, OR, SC, DC Metro, and PA;

- **TelCom Construction Inc**. ("TelCom"), located in MN (headquarters), IA, NE, SD, TX, KS, and WI; and

- **Pauley Construction LLC** ("Pauley"), located in AZ (headquarters), WY, CO, and CA.

36.     According to the confidential witness ("CW") 3 in the securities class action entitled *Tung v. Dycom Industries, Inc., et al.*, Case 9:18-cv-81448-RLR (S.D. Fla.) ("Securities Class Action"), and upon information and belief, Ivy and Star are two of the Company's largest revenue generating subsidiaries with respect to fiber projects.  Moreover, upon information and belief, CW11 stated that Ansco was a "big revenue generator" for the Company as well.

37.     Most of the Company's subsidiaries employ 100 employees or less per state.  As discussed below, the Company's subsidiary companies lacked the staffing, skill, and expertise necessary to handle projects from the Company's largest clients, such as Verizon and AT&T, resulting in significant project delays and cancelled contracts and, ultimately, a substantial decline in revenue.

**C.     The Company Receives the Majority of its Revenue from
Five Customers Pursuant to Master Service Agreements**

38.     The Company's customer base is concentrated, with only five customers accounting for over 75% of the Company's overall revenue: Comcast, AT&T, CenturyLink, Verizon and Charter.

39.     Most recently, for the fiscal year ended January 26, 2019, the Company reported that 21.2%, 20.8%, 19.2%, 13.6%, 3.6% and 3.6% of its contract revenues came from AT&T, Comcast, Verizon, CenturyLink, Windstream, and Charter, respectively.

40.     Over 86% of revenue derived from these customers is derived from master service agreements and other contracts that contain customer-specified service requirements.

41.     Contract revenue under these agreements is recognized over time as the services are performed and customers receive their contracted-for benefits. Output measures, such as units delivered, are utilized to assess the Company's progress against specific contractual performance obligations for the majority of its services.  Unless and until the Company and its

subsidiaries complete portions of their customer contracts, they are not able to recognize revenue.

42.     The Company's customer contracts do not guarantee a specific amount or volume of work or services to the Company and can be cancelled by the customer at any time. Therefore, it is not until a definitive work order is placed with the Company and the work is completed that revenue is assured.

43.     Because the Company's customer base is concentrated, such customers may cancel their contracts at any time and the loss of one customer could have a devastating impact on the Company's operations.   As the Company admits, because its revenue is highly concentrated among only five customers, "the highest return investment [Dycom] can make is growing the business that [it] ha[s] for customers that [it] know[s]."   Defendant Nielsen has further commented: "We've got to do a really good job with those customers given that concentration, but as long as we're able to do that, our view is that we're happy to grow with those customers."

**D.     The Company's Top Customers Announce Billion-
Dollar Deals for Large-Scale Network Expansions**

44.     The Company touted that significant developments in the telecommunications industry were driving the demand for its services mainly through its key customers.

45.     The proliferation of smartphones and other mobile data devices drove a significant demand for wireless broadband. As developments in consumer and business applications have continued to develop, including advanced digital and video service offerings, the demand for greater capacity and enhanced reliability for wireline and wireless networks has increased exponentially.

46.     To respond to this demand and other advances in technology, wireless carriers, such as AT&T and Verizon, were upgrading their networks and contemplating next generation mobile solutions, such as small cells and 5G technologies.   Telecommunications network operators increasingly deployed fiber optic cable technology deeper into their networks and closer to consumers and businesses in order to respond to consumer demand for wireless broadband, competitive realities, and public policy support.

47.     Wireless carriers have been actively spending on their networks to respond to the increase in wireless data traffic by upgrading network technologies to improve performance and efficiency and to consolidate disparate technology platforms.   As the demand for mobile broadband has grown, the Company repeated, in SEC filings, presentations and conference calls, that "a significant number of new project initiations will occur in the near-term."  The Company also reported in its quarterly reports that it expected an increase in business, because the "[s]ignificant demand for wireless broadband" was generating projects throughout the country, and "[t]hese trends are driving demand for the type of services we provide."

48.     In 2017, leading up to the Relevant Period, Verizon announced that it was launching two key fiber supply deals: (1) in April 2017, Verizon announced it would purchase 1.5 million miles of optical fiber from Corning Inc. over the next three years (2018-2020) for at least $1.05 billion; and (2) in May 2017, Verizon announced that it had a $300 million deal with Prysmian to buy 10.6 million miles of ribbon and loose tube cables over three years in connection with the expansion of its fiber network.   Defendant Nielsen informed the market during the Company's fiscal 2017 third-quarter earnings call on May 24, 2017 that these deals were "unprecedented" and a "huge opportunity":

> I guess the way I would put that -- the way I would think about it at a high level,
> Christian, is that they are in the last -- in in the 21st century, there's been no

domestic deployment of fiber that was of such magnitude that manufacturers had to add capacity, you know, actually build plants. And so I think that would tell you that *it's the biggest thing that's happened in the last seventeen years*, if you frame it that way. [Emphasis added].

49.     Verizon was not the only major customer of the Company's to announce profitable expansion plans. AT&T, which was often reported as the Company's number one customer in terms of revenue generation, announced in 2017 that it was committed to providing 12.5 million homes with fiber by just past the middle of 2019. As of the start of the Relevant Period, AT&T had less than 6 million homes with fiber, meaning AT&T intended to double this number in approximately one and a half years. AT&T also announced that it was committed to spending $25 billion in 2018 on capital expenses and was going to be the first to launch mobile 5G service in twelve cities by the end of 2018. During AT&T's third quarter 2017 earnings call on October 24, 2017, its CFO stated that the company planned to expand its high-speed internet deployment and reach more than 50 million customer locations with competitive broadband over the next few years.

50.     Thus, the Company reported benefitting from this surge in business, identifying an increase in revenue "primarily from services for customers deploying 1 gigabit networks," in its Annual Report on Form 10-K filed with the SEC on March 2, 2018 for the transition period from July 30, 2017 to January 27, 2018 (the "Transition Report"). In September of 2017, the Company's Board approved a change in the fiscal year end from the last Saturday in July to the last Saturday in January. The Transition Report covers the six-month transaction period of July 30, 2017 through January 27, 2018.

**E.**     **The Company's Permitting Delays, Understaffing and Inexperienced
Personnel Result In A Lack Of Telecommunication Opportunities**

51.     While the Company touted the opportunities that were resulting from its
customers' implementation of fiber optics and emerging technologies, the Company was unable
to capitalize on this growing industry.   Rather, the Company was losing contracts with key
customers as a result of its: (1) failure to obtain permits and (2) inability to complete contracted
projects on time even when permits were approved.   Confidential sources in the Securities Class
Action confirm that these issues occurred in large projects contracted with Verizon and AT&T,
two of the Company's largest customers.

52.     As a result of excessive delays in getting projects off the ground, the Company's
customers began cancelling their contracts.   Such cancellations and delays had a direct impact on
the Company's revenue because, for delayed projects, the Company could not recognize revenue
until the projects were completed, and for cancelled projects, the Company lost all future revenue
on that project.   According to CW11 in the Securities Class Action, and upon information and
belief, if the Company and its subsidiaries were performing well, then additional work would be
given by a customer. Thus, the fact that customers were cancelling contracts and withholding
work is strong evidence of the Company's underperformance.

**(1)     The Company's Failure to Obtain Permits**

53.     The Company is required to submit an application to local or state authorities and
apply for permits approving its and/or its subsidiaries' license to place utility facilities on public
property and engage in the construction, repair, improvement, maintenance, safe and effective
operation, and alteration and relocation of any highway.   The permit application must include a
detailed description of the project, including, the project's location, expected completion time,
facility type, material type, installation type, wire size, and length of installation, among other

details.  Diagrams and plans illustrating the work to be completed must also be submitted with the permit application and the Company is required to pay a permit fee based on the amount of work to be completed.

54.     For each project, the Company works on, more than one permit may be required and from multiple permitting authorities.  For example, a separate permit is required each time work is to be performed over a waterway or bridge or through a railroad.  Each of these requires a permit to be submitted to the appropriate authority that owns the structure or area that the Company is working in.

55.     Overall, the process to obtain a permit may take close to a year.  Once a permit application is submitted, it may go through multiple layers of review before obtaining approval. If a permit fails to meet one of the prerequisites for approval, it will be denied.  A permit may also be denied if it lacks sufficient detail or necessary documentation. In such instances, the permitting authorities may request additional information from the applicant and the permit is put on hold until that information is received.  A permit may take as little as two weeks to as long as one year from the date of application to receive approval depending on the approving authority and the Company's relationship with it.  If deficiencies are found with the application then the process may take even longer.  The Company, its subsidiaries, and its subcontractors were required to continue to comply with permit requirements throughout a project's pendency.

56.     For those working in the utilities industry, the requirements and process for obtaining permits is common knowledge and common practice.  In order to meet deadlines, it is imperative that permits are submitted well in advance of the start of a project and that the required information and prerequisites be met.

57.     However, the Company regularly failed to meet permit deadlines on key customers' projects, resulting in excessive delays, missed project deadlines, and cancelled contracts.  Even when customers did not cancel their contracts, there still were substantial delays in the initiation and completion of projects, thereby delaying the Company's recognition of any revenue.  These delays were so substantial, that employees who were not involved in the permit process were aware of them.  For example, according to the Securities Class Action, although CW11 did not deal with permits, he/she stated that it was well known in the office that there were persistent delays in obtaining the necessary permits to initiate projects.

58.     Throughout the country, the Company was missing project initiation and completion deadlines, leading Verizon to cancel major contracts with the Company. These contracts concerned Verizon's One Fiber project, which focused on installing fiber lines throughout the United States in order to connect the Verizon network and create a 5G network.

**Delays in Georgia**

59.     For instance, according to the Securities Class Action, CW4 was a Project Manager from May 2017 until August 2018 for the Company's subsidiary, Engineering Associates, who was primarily responsible for handling the Verizon One Fiber project in Atlanta, Georgia.  According to CW4, and upon information and belief, Verizon had contracted 3,000 miles of fiber one cable installation with Engineering Associates as part of the Verizon One Fiber project in Atlanta.

60.     According to the Securities Class Action, CW4 stated that there were a large number of permitting issues with the Verizon One Fiber project that were the result of the Company's lack of adequate staffing and incompetence.  Upon information and belief, according to CW4, there was only one individual contractor in charge of Verizon's permits, but that

contractor did not know what he was doing. CW4 further explained that the permitting department had a "big problem" because people would quit after only a day or week so there was a "huge turnover" in that section." As a result of these issues, CW4, was asked to step in and help the contractor obtain permits from the Department of Transportation ("DOT") for work occurring in Georgia.

61.     According to the Securities Class Action, once CW4 became involved, he quickly saw that a lot of permits submitted for approval had been rejected by the DOT, but were sitting untouched and "[n]obody was doing anything about it." These permits were rejected because the submitted drawings and information were inaccurate, or the DOT had requested information that the Company had failed to provide. Instead of responding to these deficiencies or requests, the permits sat untouched and the One Fiber project was delayed.

62.     As a result of the permit delays, in March or April of 2018, Verizon only let Engineering Associates install 1,000 miles of cable and cancelled the remaining 2,000 miles of contracted work. Once the contract was cancelled, according to the Securities Class Action, CW4 said he was in charge of collecting the engineering prints and information on what had been completed so that it could be sent to the Company and Verizon. With two-thirds of the project cancelled, according to the Securities Class Action, CW4 reflected that he was "sure there was a lot [of money] lost there." In fact, not only had the Company lost the contract, but according to CW4 in the Securities Class Action, at the time the contract was cancelled, Engineering Associates had already completed 80% of the engineering design work. Therefore, "[o]nce they did the carve-out, there were a ton of miles that they had paid to field and engineer [people]," costs the Company could not recuperate. These under absorbed labor costs resulted in significant margin pressure on the Company that would force the Company to lower forecasts.

**Delays in Kentucky, Ohio, and Indiana**

63.     The problems with the One Fiber Project were not limited to Georgia. Rather, they were Company-wide.  For instance, according to the Securities Class Action, CW5, a Project Manager on the One Fiber project in Louisville, Kentucky, witnessed similar permitting issues.  According to the Securities Class Action, CW5 explained that in May 2018 Star was awarded approximately 130 miles of buried lines and 70 miles of aerial lines in Louisville. By June of 2018, it became apparent that the project was experiencing serious problems with obtaining permits so CW5 was brought in to address these permit issues, as well as to manage most of the new work being performed on the Verizon One Fiber project in Louisville and to act as the liaison between Star and Verizon.  According to CW5, and upon information and belief, when he first started working on this project, he walked into "the middle of a nightmare" where Star was in danger of losing the entire contract with Verizon.

64.     According to CW5, and upon information and belief, although Star was one of the Company's largest subsidiaries, it was in "a little over their head" on this project due to permitting issues.  At the time, the Company's Tampa, Florida based subsidiary, Tesinc, was responsible for obtaining permits on the One Fiber Project in Louisville, Indianapolis, and Cincinnati. However, Tesinc only had one representative in charge of filing permits for each market, meaning one representative for each of Louisville, Indianapolis, and Cincinnati. According to CW5, upon information and belief, there was a lot of pressure on the permit department but this one-person department was too small to handle the volume of permits.

65.     According to the Securities Class Action, CW5 explained that this created a problem because Star kept making "shot calls," which were self-imposed deadlines where Star would assure Verizon that "this is what you can expect on this date" in terms of completed work.

However, Star was never able to deliver on those dates, which made Verizon "pretty upset." According to the Securities Class Action, while CW5 was brought in to fix these discrepancies in timing, Star's management was so focused on basing deadlines off of data trackers that it failed to account for human error and delays that could occur.  As a result, the self-imposed schedule was always off.

66.     According to the Securities Class Action, one of the major problems CW5 highlighted was Tesinc's failure to apply for multiple permits that were needed at the start of the project, in May and June of 2018.  Instead of focusing on the permitting issues early in the project, which meant knowing the requirements and dates for the entire project, Star took the path of, "let's do this one line, one section."   According to the Securities Class Action, according to CW5, Star had to cross interstates, bridges, railroad, and waterways as part of the One Fiber project, each of which requires its own permit.  Because every permit submitted to the city or municipality had a six-month waiting period before being approved, permit requests should have been submitted at least 180 days ahead of the target start date in order to remain on schedule. This period was less for railroad and interstate permits, which took approximately thirty days and sixty days, respectively, on average.  If Star did not submit the permit in advance, the project could be stalled for up to six months while waiting for the permit approval.

67.     Because Tesinc was not at the top of their game with obtaining permits, according to the Securities Class Action, CW5 stated that it caused the rest of the project team to fall behind.  By not planning ahead, upon completion of the first section of the project, Star would then be delayed on the second section because it did not obtain the requisite permit.  For example, if the second half of the project required crossing a river but Star did apply for a permit to cross, Star could not cross and would need to wait six months before proceeding.

68.     Even if Tesinc submitted all the required permits at once, Tesinc failed to take into account the fact that municipalities could only review a limited number of those permits per day.  Moreover, if any of those permits were kicked back, it could be an extra thirty days before the permit was fixed and reviewed on top of that.  However, if changes were made to the plan design during the project, those permits had to be resubmitted for approval, a process which could take an additional six months.

69.     According to the Securities Class Action, CW5 stated that by June of 2018, the One Fiber Project was falling so far behind schedule that Star started pushing the city to process the permits faster.  However, the city did not expedite review of those permits and the same six-month waiting period applied as with all other permits.

70.     According to the Securities Class Action, CW5 explained that when Star first figured out that the One Fiber project was falling behind in June 2018, before CW5 was hired, Dave Hamlin, Star's PMO Manager, and Mindy Piper, Star's Regional Program Controls Manager, created an excel spreadsheet to manage the process.  The data collected included every employee's timetable for when they had to submit permits they were in charge of, what they should submit with the application, when they needed to follow-up with permitting office, and other targets.  Even with this new spreadsheet, however, Tesinc did not submit permits on a timely basis because Tesinc had its own way of handling permits and was not interested in Star's input.

71.     According to the Securities Class Action, when CW5 started in August 2018, he had to attend periodic team meetings with Tesinc, where Star would express to Tesinc that it needed its permits to be submitted on time or else the Verizon One Fiber project would fall behind.   Upon information and belief, CW5 recalled that in September of 2018, Tom Bones,

who reported directly to the Company, called all the departments – construction, project managers, engineers, and designers – into a room to fix the permit delay issue. CW5 attended this meeting along with Bones, Hamlin, Piper, Kirby, and the Verizon Project Manager.  Star had to explain to Verizon why Star was not meeting the deadlines. According to the Securities Class Action, CW5 recalled that a similar meeting had been held in late August with these individuals as well.  Upon information and belief, CW5 stated that Bones reported to the Company what occurred at these meetings. According to CW5, ultimately, "nothing ever came of these meetings" and the delays continued.  Because Tesinc was a subsidiary of the Company, CW5 said Tesinc was "protected by Dycom" and there was not much Star could do other than a slap on the wrist.  According to CW5, the "Verizon project manager was pretty pissed off at [Star] because [it was] not meeting timelines and schedules or doing the things [it] promised to do." The Verizon project manager would "eat [Star] alive" during daily calls between Star and Verizon and would call Star out on their "untrue facts because their data was so messed up." According to the Securities Class Action, CW5 stated that there was a constant threat from Verizon to take away the project due to the missed deadlines and permitting issues.

72.    According to the Securities Class Action, although CW5 was brought in to address issues with the One Fiber project, including the permitting issues, he was micromanaged by Star's management to the point where he was unable to resolve any issues. Upon information and belief, CW5 further commented that these permitting issues were even greater in Cincinnati and Indianapolis.  Cincinnati had been awarded the Verizon One Fiber contract in May 2018 and Indianapolis received it around January 2018. CW5 stated that the Project Manager in Indianapolis disclosed to CW5 that he was experiencing the same issues as CW5.

73.     During the Relevant Period, the Company also did not have enough workmen to complete the jobs for which it did obtain a permit, including for the Verizon One Fiber Project. For instance, according to the Securities Class Action, CW5 stated that Star would many times perform a "look-ahead," where Star would estimate its future completion date on the One Fiber project.  Star would submit these estimates to the Verizon Project Manager, who was a "tracker guru" and "master of data."  The Verizon Project Manager would look at the data and tell Star right off the bat that Star was not going to meet the proposed deadline because he could see that Star did not increase its manpower to meet that estimate. According to the Securities Class Action, CW5 also stated that the project turnover rate among Project Managers was high. Within six months to a year, Star lost two project managers in Louisville, three in Cincinnati, and three in Indianapolis.

74.     According to the Securities Class Action, CW12 corroborated CW5's account with respect to the Verizon One Fiber project delays.  Upon information and belief, CW12 was responsible for obtaining permits for Verizon's account in Cincinnati, Ohio at Telcom. According to the Securities Class Action, CW12 admitted that "nobody [at Tesinc] really knew what they were doing" and they had to figure it out as they were going, and did not have any direction from Phil Brandt, the Permitting Manager.

75.     For example, according to the Securities Class Action, until CW12's departure in June 2018, Tesinc neglected to research the permit requirements for each permitting authority and state, which resulted in rejected permits and delays on the Verizon One Fiber project.   Upon information and belief, CW12 explained that Tesinc was required to get permits from railroad companies in order to do work in their rail yards. However, Tesinc often applied to the wrong company for a permit.

**Delays in Texas**

76.     According to the Securities Class Action, CW7 stated that as a result of Texstar's disorganization and failure to hire the correct personnel, in February of 2018, Texstar lost a $55 million dollar, 10-year contract with Verizon regarding the One Fiber project in Texas.   Upon information and belief, CW7 was informed by Vice President, Pete Espinoze, and Senior Vice President of Operations, Larry Rucker, that Verizon terminated the contract because Texstar was "disorganized, didn't have [its] ducks in a row, and didn't hire the correct personnel to kick off the project in time."

**Delays in Tennessee**

77.     According to the Securities Class Action, CW1, a Star employee in Tennessee, recalled that a Verizon contract was awarded to Star in early 2018, yet there was not much activity on the account until the summer of 2018.   Upon information and belief, CW1 explained that activity only happens as parts of the project are completed, meaning the Verizon project was not making any progress or being completed until at least the summer or fall of 2018.

**Delays in Florida**

78.     The Company lost substantial revenue as a result of permit issues with its AT&T contract.   According to the Securities Class Action, CW6, the District Manager of subsidiary Ivy, provided managerial oversight across the state of Florida over the multi-million-dollar contract that the Company received for AT&T's "LightGig" FTTX residential upgrade (the "FTTX Project").   Upon information and belief, according to CW6, the FTTX Project generated an average of $2 million per month for the Company in productivity and network construction. Depending on the month, this project generated as much as $5-$7 million in one month alone. CW6 was responsible for assessing production goals, project milestones, and current staffing.

79.     According to the Securities Class Action, according to CW6, when he first joined Ivy in October 2017, the FTTX Project was a "train wreck" and delayed by two months due to permitting and resource allocation issues.  CW6 explained that the project timeline for the FTTX Project had been set prior to Hurricane Irma striking in August of 2017. After Irma hit, it devastated operations in much of Florida because approximately half of Ivy's workforce was sent to Puerto Rico to reestablish electrical lines, where that workforce remained for a full year. With half the work force gone, Ivy fell behind on the preestablished deadlines on the AT&T project.

**Delays in Tennessee**

80.     Project delays on AT&T's fiber projects were also experienced in Nashville, which required more permits than many other areas.   According to the Securities Class Action, according to CW1, once it was discovered that the contract manager on this project had not been submitting permits on time in late spring/early summer 2018, Christine Brew created Smartsheets in order to monitor the permit process on the account.  The tracker contained information such as the date a permit needed to be submitted, the permit number, the area the permit covered, the fee associated with the permit, and whether the permit was approved. Star would constantly meet with the Company to discuss the permit tracker.

F.     **Daily Reports and Weekly and Monthly Meetings**

81.     At all relevant times, the Company controlled each of its subsidiaries, with a reporting structure that flowed directly from the Company's CEO (Defendant Nielsen) to each subsidiary.  While the Company's subsidiaries performed the work required for each customer contract, the Company managed and controlled the operations of each subsidiary.

82.     According to the Company's Transition Report, management of each of the Company's subsidiaries report to the Company's Chief Operating Officer (Tim Estes), who reports to the Chief Executive Officer (Defendant Nielsen), "the chief operating decision maker." Former Company employees further explained that each Dycom President reports direct to Defendant Nielsen in monthly telephonic meetings where, among other things, the status of all projects and finances were discussed.

83.     Throughout the Class Period, the Company exercised control over each of its subsidiaries, by dictating which projects each subsidiary could accept, providing only limited information about each project to its subsidiaries, mandating certain policies and internal programs each subsidiary was to use, and handling payroll and customer invoicing for all of its subsidiaries.

84.     According to the Securities Class Action, according to CW1, the Company exerted this control over Star as well as all of the Company's subsidiaries when it came to Verizon contracts.   Upon information and belief, CW1 explained that the Company determined which work Star could accept and Star had "no choice whatsoever" in that determination. Once a contract was awarded, the Company possessed the pertinent documents for that contract, including the master contract, and only conveyed limited information to Star.

85.     According to the Securities Class Action, this control was corroborated by CWs 3 and 8.   Upon information and belief, according to CW3, all of Ansco's contract negotiations were handled by Dycom's COO Tim Estes, along with the George Summers, the head of Ansco, and Dubi Kazula, VP of Ansco's Wireless Operations.   CW8 similarly stated that approval had to be obtained from Dycom before Texstar could accept a contract.   CW8 explained that Texstar couldn't make a move without Dycom in that market.

86.     According to the Securities Class Action, CW9 corroborated these accounts, reporting that Defendant Nielsen and COO Estes might become involved in all contract bidding when multiple subsidiaries were dealing with the same customer in order to coordinate each subsidiary's efforts. Upon information and belief, CW9 stated that Nielsen and Estes stepped in if a large customer was involved, such as Verizon or AT&T, and would provide advice when a relationship with a large customer went sour.  Defendant Nielsen and Estes consulted with the president of the subsidiary to ascertain what the customer was asking for and what the subsidiary could do to prevent losing that customer.

87.     According to the Securities Class Action, CW1 also explained that the Company exercised its control by placing members of the Company in key positions at Star.

**G.     The Company Tracked Its Subsidiaries' Projects On A Daily Basis**

88.     At all relevant times, the Company oversaw and monitored the projects of each of its subsidiaries through internal programs that were regularly accessed by Defendant Nielsen and the Audit Committee Defendants.  Each of the Company's subsidiaries created daily reports to which Defendant Nielsen and the Audit Committee Defendants had direct access. In some circumstances, these programs were hand selected by the Company for its subsidiaries to use.

**Star – CPS, The Dailies, and Smartsheets**

89.     According to the Securities Class Action, CW1 stated that the Company introduced a new front-end software system to Star called CPS, or the "whip system," in early 2017 that was an accrued revenue system used to track day-to-day transactions and the progress of all projects.  While Star did not select this program, the Company selected it and was "taking more and more control over the different segments of Star."   There was a heavy conversion

process of about six to nine months before Star was fully converted to CPS by the fall of 2017. CPS was used by all of Star's hubs.

90.     According to the Securities Class Action, according to CW1, the information in CPS came from reports called "Dailies," which were the primary source documents in the construction business and used by all of the Company's subsidiaries.  Upon information and belief, CW1 explained that each day, an individual employee or contract laborer from each subsidiary submitted the "Daily" report to the Company, reporting on their subsidiary's work for the day. The "Dailies" included information such as the project(s) worked on, labor hours, equipment needed, project delays and other operational metrics.  Thus, the Dailies would have included information on how much progress was made each day on a project, which would have alerted Defendant Nielsen and the Audit Committee Defendants of the delays in the Verizon One Fiber and AT&T projects, as the Dailies failed to show any activity on the Verizon project until late 2018, and permits were not being filed on time for the AT&T project in the spring or summer of 2018.

91.     The Dailies would have further shown that: (i) Star's projects in Mississippi were experiencing delays; and (ii) the One Stream contract in Iowa was cancelled in October 2017.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

92.     November 20, 2017, the Director Defendants caused Dycom to issue a press release announcing the Company's first quarter 2018 financial results for the period ended October 28, 2017.  The press release stated, in relevant part:

> PALM BEACH GARDENS, Fla., Nov. 20, 2017 /PRNewswire/  -- Dycom Industries, Inc. (NYSE: DY) announced today its results for the fiscal quarter ended October 28, 2017. This announcement is one day earlier than previously scheduled and the conference call to review the Company's results is now scheduled for Monday, November 20, 2017 at 9:00 a.m. (ET). Specific dial-in and replay information appears below.

The schedule change is a result of the Company's preliminary determination that certain documents containing financial information were subject to unauthorized access after the market closed on Friday, November 17, 2017. The Company's investigation is ongoing and law enforcement authorities have been notified.

•       Contract revenues of $756.2 million for the quarter ended October 28, 2017, compared to $799.2 million for the quarter ended October 29, 2016. Contract revenues for the quarter ended October 28, 2017 decreased 8.4% on an organic basis after excluding $8.6 million of contract revenues from an acquired business that was not owned during the prior year quarter and $15.5 million of contract revenues from storm restoration services in the current period.

•       Non-GAAP Adjusted EBITDA of $97.6 million, or 12.9% of contract revenues, for the quarter ended October 28, 2017, compared to $129.2 million, or 16.2% of contract revenues, for the quarter ended October 29, 2016.

•       On a GAAP basis, net income was $28.8 million, or $0.90 per common share diluted, for the quarter ended October 28, 2017, compared to net income of $51.0 million, or $1.59 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income was $31.6 million, or $0.99 per common share diluted, for the quarter ended October 28, 2017, compared to Non-GAAP Adjusted Net Income of $53.7 million, or $1.67 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income for the quarters ended October 28, 2017 and October 29, 2016 excludes $4.5 million and $4.3 million, respectively, of pre-tax interest expense incurred for non-cash amortization of the debt discount associated with the Company's 0.75% convertible senior notes due September 2021.

Net income and Non-GAAP Adjusted Net Income for the quarter ended October 28, 2017 include an income tax benefit of approximately $0.9 million for the tax effects of certain share-based award activities as a result of the Company's adoption of Accounting Standards Update No. 2016-09, *Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting* ("ASU 2016-09"). This tax benefit would have been recorded to additional paid-in-capital under the previous accounting standard.

The Company also announced its outlook for the fiscal quarter ending January 27, 2018. The Company currently expects total contract revenues for the fiscal quarter ending January 27, 2018 to range from $645 million to $675 million. On a GAAP basis, diluted earnings per common share for the fiscal quarter ending January 27, 2018 is expected to range from $0.15 to $0.27. Non-GAAP Adjusted Diluted Earnings per Common Share is expected to range from $0.24 to $0.36. Non-GAAP Adjusted Diluted Earnings per Common Share

30

guidance excludes $4.6 million of pre-tax interest expense for non-cash amortization of debt discount, or $0.09 per common share diluted on an after-tax basis. A reconciliation of Non-GAAP Adjusted Diluted Earnings per Common Share guidance provided for the fiscal quarter ending January 27, 2018, along with reconciliations of other Non-GAAP measures, is included within the press release tables.

93.     The same day, the Company held a conference call to discuss the financial results.

During the call, defendant Nielsen stated, in relevant part[1]:

Revenue was $756.2 million, a decrease of 5.4%. Organic revenue, excluding $15.5 million of storm restoration services in the quarter declined 8.4%. This quarter reflected an increase in demand from three key customers as we deployed 1 gigabit wireline networks and grew core market share, offset by near-term moderation by a large customer. Gross margins were 20.55% of revenue, reflecting solid operating performance, offset by the impacts of the decline in revenue. General and administrative expenses were 8.54%.

* * *

The industry effort required to deploy these converged networks has and will meaningfully broaden our set of opportunities. Total industry opportunities in aggregate were already without precedent, in our experience, prior to this deployment. We are providing program management, planning, engineering and design, aerial and underground construction and fulfillment services for 1 gigabit deployments. These services are being provided across the country in dozens of metropolitan areas to a number of customers.

In addition, we have secured a number of converged wireless/wireline multi-use network deployments. Planning, engineering and limited construction have begun.

***Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018. Customers are continuing to reveal with specificity new multi-year initiatives that are being planned and managed on a market-by-market basis.***

Our ability to provide integrated planning, engineering and design, procurement and construction and maintenance services is of particular value to several industry participants.

94.     Regarding backlog, defendant Nielsen stated:

---

[1]     Unless otherwise stated, all emphasis is added.

> Backlog at the end of the first quarter was $6.198 billion versus $6.016 billion at the end of the fourth quarter of 2017, an increase of approximately $182 million. Of this backlog, approximately $3.039 billion is expected to be completed in the next 12 months. We are particularly pleased with the increase in our next 12 months backlog as it clearly signals meaningful organic growth for our fiscal 2019, the 12-month period ending January 2019.

95.     During the call, defendant DeFerrari stated, "We expect accelerating fiber deployments for newly emerging wireless technologies, increasing wireless services and solid demand from several large customers reflecting 1 gigabit deployments and fiber deep cable capacity projects."   DeFerrari further identified multiple reasons for Dycom's decreasing operating margins, none of which was the permitting issues, contract delays, or loss of contracts:

> Compared to Q1 of last year, gross margin decreased 251 basis points. Three factors proportionately impacted the margins: Specifically, approximately one third of margin percentage variance was from labor and subcontractor labor costs, reflecting the mix of work activity and the near-term margin impacts as we initiated the new programs; another one third of the negative variance related to lower absorption of equipment costs as well as fuel costs; and lastly, one third of the variance resulted from negative leverage on facility expenses and certain field operating costs as we operated at a lower revenue level in the quarter.

> Despite near-term pressures on gross margins, we are confident that our operating leverage will improve as we resume growth in fiscal 2019. G&A expense increased 100 basis points to 8.5% of revenue in Q1 '18. The year-over-year G&A variance, mostly resulted from the impact of labor costs, which are supporting our expanding scale to address growth initiatives.

96.     Defendant Nielsen also stated that "As with prior initiations of large-scale network deployments, [the Company] expect[ed] some normal timing volatility and customer spending modulations as network deployment strategies evolve and tactical considerations, primarily permitting impact timing."

97.     During the same call, analysts wanted to clarify whether the permitting holdups reflected the scale of these capital plans or whether "there [is] something else specific going on." Defendant Nielsen assured that it wasn't "anything unusual."  He stated, in relevant part:

[W]hen you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. ***It is not anything unusual, and unlike other adjacent spaces where you have larger projects, these are typically local municipal permits, they're not federal permits. We're not talking about environmental studies or other types of permitting.*** And, in fact, just recently, the FCC passed a rule that actually will speed around small cells, some of the permitting by removing some local reviews that were already occurring. So I think it'll get better, it always does. But at this stage in these projects, it's always something to watch.

98.     During the same call, defendant Nielsen reported an increase in the headcount to 14,393, from 13,236 for the fiscal quarter ended January 28, 2017.  Analysts noted that the employee count was "surprising" and confirmed whether "that's just part of the absorption comments that [the Company] feels very comfortable hiring more heads, given the line of sight [it] see[s] coming down the pike."  During the Q&A session of the call, an analyst asked about the reasons for this headcount increase. In this exchange, a representative of the Company stated in relevant part:

[W]ith respect to the employee count, as we've talked about on the last call, we certainly are adding engineers, planners, designers, project managers. We're setting up warehouse locations to support these new project initiations. And the core business, is busy. I mean you look at the housing numbers, there are other things that are driving that headcount, but we're getting ready. Well, we're not getting ready, we're doing the engineering work we need to get started.

99.     Regarding the impact of the new large projects, defendant DeFerrari stated that "gross margin percentage [was expected] to be in line or slightly better compared to the April 2017 quarterly margin, reflecting the expected mix of work activity and improving performance as services for large customer programs begin to accelerate."  When asked how management was confident that "gross margins will get back to flat, given the fact there will still be early in some of these large programs," defendant Nielsen responded, in relevant part:

So Adam, if you remember, Drew's comments and Drew can amplify on this, are talking about absorption, right? ***We are incurring some costs in the January***

*quarter that we think we get the benefit of as revenue returns, at least in line and possibly growth.*

100.   Also during the call, when asked by an analyst whether the permitting holdups were "just a function of the scale of some of these capital plans that your customers -- or is there something else specific going on?"  Defendant Nielsen denied that the delays were caused by internal problems at Dycom, stating: "No. It's exactly your point… is that when you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. It is not anything unusual."

101.   Accompanying the November 20, 2017 conference call was a presentation that Dycom attached to a Form 8-K filed later the same day.  Among other things, the presentation contained the following slide:



# Industry Update

❖ *Industry increasing network bandwidth dramatically*
  ➢ Major industry participants deploying significant 1 gigabit wireline networks
  ➢ Emerging wireless technologies require incremental wireline deployments
    ○ A complementary wireline investment cycle is underway to facilitate applications enabled by fully converged wireless/wireline networks
  ➢ Industry developments are producing opportunities which in aggregate are without precedent. Converged wireless/wireline network deployments only further broaden our set of opportunities.



❖ *Delivering valuable service to customers*
  ➢ Currently providing services for 1 gigabit full deployments across the country in dozens of metropolitan areas to a number of customers
  ➢ Have secured and are actively working on a number of converged wireless/wireline multi-use networks
  ➢ Customers are revealing with more specificity multi-year initiatives that are being implemented and managed locally



❖ *Our ability to provide integrated planning, engineering and design, procurement and construction and maintenance services provides value to several industry participants*

❖ *Dycom's scale, market position and financial strength position it well as opportunities continue to expand*

5

102.    The presentation concluded as follows:

## Conclusion 

***Firm and strengthening end market opportunities***

❖ Fiber deployments in contemplation of newly emerging wireless technologies have begun in many regions of the country. A significant number of new project initiations will occur in the near term.

❖ Wireless construction activity in support of expanded coverage and capacity is poised to accelerate.

❖ Telephone companies deploying FTTH to enable video offerings and 1 gigabit connections. This activity is expected to reaccelerate in the near term.

❖ Cable operators continuing to deploy fiber to small and medium businesses and enterprises with increasing urgency. Fiber deep deployments to expand capacity, new build opportunities and overall cable capital expenditures are increasing.

❖ Customers are consolidating supply chains creating opportunities for market share growth and increasing the long-term value of our maintenance business. We are increasingly providing integrated planning, engineering and design, procurement and construction and maintenance services for our customers.

***Encouraged that industry participants are committed to multi-year capital spending initiatives; these initiatives are increasing in numbers across multiple customers***

13

103.    On November 21, 2017, the Director Defendants caused Dycom to file a Form 8-K attaching the transcript of the investor conference call excerpted directly above.

104.    On November 22, 2017, the Director Defendants caused the Company to file its Form 10-Q for the quarter ended October 28, 2017.  The Form 10-Q was signed by defendants Nielsen and DeFerrari, and stated that while the Company could theoretically experience permit delays, there had been no material project delays to date:

Our CIEB balances are maintained at a detailed task-specific level or project level and are evaluated regularly for realizability. These amounts are invoiced in the normal course of business according to contract terms that consider the completion of specific tasks and the passage of time. Project delays for commercial issues such as permitting, engineering changes, incremental documentation requirements, or difficult job site conditions can extend the time needed to complete certain work orders, which may delay invoicing to the

customer for work performed. We were not experiencing any material project delays or other circumstances that would impact the realizability of the CIEB balance as of October 28, 2017 or July 29, 2017.

105.    The Form 10-Q disclosed that the Director Defendants "expect to complete 49.0% of the October 28, 2017 total backlog during the next twelve months."

106.    The Form 10-Q stated that, although there had been no material delays, revenue might be recognized at different times if there were permitting delays:

> Revenue estimates included in our backlog can be subject to change because of project accelerations, contract cancellations, or delays due to various factors, including, but not limited to, commercial issues such as permitting, engineering changes, incremental documentation requirements, difficult job site conditions, and adverse weather. These factors can also cause revenue to be realized in different periods or in different amounts from those originally reflected in backlog.

107.    On February 12, 2018, the Director Defendants caused the Company to issue a press release disclosing lowered expectations for the second quarter of fiscal 2018 and first quarter of fiscal 2019.   The press release blamed "Widespread adverse weather reduced the number of available workdays and negatively impacted productivity and margins during the quarter ended January 27, 2018. Margins were also impacted by costs incurred in conjunction with the initiation of large customer programs."   Notwithstanding the lowered expectations, the Director Defendants caused the Company to issue the following guidance:

| | Fiscal 2019 | Quarter Ending April 28, 2018 (Q1-19) |
|---|---|---|
| Contract revenues | $3.30 - $3.50 billion | $720 - $750 million |
| Diluted Earnings per Common Share - GAAP[1] | $4.78 - $5.70 | $0.52 - $0.67 |
| Non-GAAP Adjusted Diluted Earnings per Common Share[1] | $5.22 - $6.14 | $0.63 - $0.78 |
| Non-GAAP Adjusted EBITDA % of revenue | 13.6% - 14.1% | 10.7% - 11.1% |

108.    On February 28, 2018, the Director Defendants caused Dycom to issue a press release announcing its second quarter and six-month results for the period ended January 27, 2018.   The February 28, 2018 investor presentation also concealed the true reasons for the reduced expectations:





109.   The   investor   presentation   announcing   the   results   contained   identical misrepresentations to the ones reproduced above from the November 20, 2017 investor presentation, including defendant Nielsen's repetition of the false statement made by defendant Ferrari: "We expect accelerating fiber deployments for newly emerging wireless technologies, increasing wireless services and solid demand from several large customers reflecting 1 gigabit deployments and fiber deep cable capacity projects."

110.   The   same   day,   the   Company   held   an   investor   conference   call   to   discuss   the results.  During the call, defendant Nielsen again stated:

> As with prior initiations of large-scale network deployments, we expect some normal timing volatility and customer spending modulations as network deployment strategies evolve and tactical considerations, primarily permitting, impact timing.

* * *

The industry effort required to deploy these converged networks has, and will, meaningfully broaden our set of opportunities. Total industry opportunities in aggregate, are robust. We are providing program management, planning, engineering and design, aerial and underground construction and fulfillment services for 1 gigabit deployments. These services are being provided across the country in dozens of metropolitan areas to a number of customers.

In addition, we have secured a number of converged wireless/wireline multi-use network deployments across the country.

111.   Regarding backlog, defendant Nielsen stated:

Backlog at the end of the second quarter was $5.847 billion versus $6.198 billion at the end of the first quarter of 2018, a decrease of approximately $351 million. Of this backlog, approximately $3.047 billion is expected to be completed in the next 12 months. We are pleased with our next 12 months backlog as it clearly signals meaningful organic growth for fiscal 2019, the 12-month period ending January 2019. Both backlog calculations reflect solid performance as we book new work and renewed existing work. We continue to anticipate substantial future opportunities across a broad array of our customers.

112.   Defendant DeFerrari stated:

As we look ahead to fiscal 2019, we continue to see a broad set of customer opportunities which are expected to drive meaningful growth. This guidance reflects the anticipated timing of activity on large customer programs and the related impacts on margins, as well as consideration of near-term weather conditions.

* * *

For the April 2018 quarter, which is Q1 of fiscal 2019, we currently expect total revenue to range from $720 million to $750 million, which reflects accelerating fiber deployments for emerging wireless technologies, wireless services that begin to ramp and solid demand from several large customers.

Non-GAAP Adjusted Diluted EPS is to range from $0.63 to $0.78 per share, based on estimated diluted shares of approximately 31.8 million and Non-GAAP Adjusted EBITDA percent to range from 10.7% to 11.1%. The margin outlook for Q1 2019 reflects the anticipated timing of activity on large customer programs and the related impacts on margins, as well as consideration of near-term weather conditions.

113.    During the call, the following colloquy occurred between defendant Nielsen and

an analyst:

**Robert J. Burleson** *Canaccord Genuity, Inc.*

Hello. Sorry, guys. I was on mute. Yeah. Well, I guess a lot of good questions
have been asked. I guess I want to understand a little bit better what the drivers
are of gross margin this year. I know you're not giving specific gross margin
guidance, but if there are any particular mix issues, large projects that are kind of
coming to an end where maybe the margins are better at the tail end, anything
besides kind of just seasonality kind of winter patterns that you guys alluded to?

**Defendant Nielsen**

Sure. So Bobby, I guess first thing is we don't have any major programs coming
to an end. Generally, they're going to accelerate through the year, I mean that's
how organic growth is kind of call it 10% in the year, right, so I think we see that.

I think it's particularly when you have a large number of projects under one big
program that are starting up all over the country, you've got to spend to build your
infrastructure around warehousing and office and yard space, in the ability to
handle that growth and we are putting that in place, have put a good portion of it
in place, more to go. And as that revenue comes through, the revenue will
certainly grow faster than that, then the support cost will, as we go through the
balance of the calendar year, for this fiscal 2019.

* * *

**Robert J. Burleson** *Canaccord Genuity, Inc.*

And then, just looking at the major areas like some of the 5G spending that's
happening this year, maybe FirstNet, if you had to look at different buckets of
growth, can you kind of rank where you think the growth is strongest and maybe
where there is the most potential for variability versus your expectations?

**Defendant Nielsen**

Yes. I think we have pretty good visibility across all of the programs. If you think
about Fiber-to-the-Home with AT&T, there's a commitment in 2019. They've
indicated that based on tax reform that they're going to spend incremental dollars
there. So there's clearly a plan there. There's clearly a plan across FirstNet.
Clearly, with Verizon's stated public goal to deploy a fixed broadband, which is
reliant on deep fiber deployments to 25 or 30 million homes and perhaps more
over the next three to four years, as well as the cable capacity projects we're
involved with to expand network capacity, I think all of those are strong.

114.    On March 2, 2018, the Director Defendants caused Dycom to file the Transition Report with the SEC.   The Transition Report was signed by defendants Nielsen, DeFerrari, Coley, Duke, Gertel, Gustafsson, Higgins, and Thomsen, and falsely claimed that: "[w]e were not experiencing any material project delays or other circumstances that would impact the realizability of the CIEB balance as of January 27, 2018 or July 29, 2017."   The Transition Report also stated:

> Our backlog consists of the estimated uncompleted portion of services to be performed under contractual agreements with our customers and totaled $5.847 billion, $6.016     billion and $6.031     billion at January 27, 2018, July 29, 2017, and July 30, 2016,    respectively.    We     expect    to    complete 52.1% of the January 27, 2018 total backlog during the next twelve months.

> * * *

> In many instances, our customers are not contractually committed to procure specific volumes of services under a contract. Revenue estimates reflected in our backlog can be subject to change due a number of factors, including contract cancellations or changes in the amount of work we estimated to be performed at the time of calculating the backlog amount. In addition, revenue reflected in our backlog may be realized in different periods from those previously reported due to these factors as well as project accelerations, or delays due to various reasons, including, but not limited to, commercial issues such as permitting, engineering revisions, difficult job site conditions, and adverse weather. The amount or timing of our backlog can also be impacted by the merger or acquisition activity of our customers. While we did not experience any material cancellations during the 2018 transition period or fiscal 2017, 2016, or 2015, many of our customers may cancel our contracts upon written notice regardless of whether or not we are in default. The amount of backlog related to uncompleted projects in which a provision for estimated losses was recorded is not material.

115.    Regarding Dycom's revenues, the Transition Report stated:

> Revenues decreased by approximately $153.3 million as a result of moderation by a large telecommunications customer during the six months ended January 27, 2018. Revenues also decreased by approximately $50.3 million for services performed on a customer's fiber network and by approximately $35.7 million for services performed for a telecommunications customer in connection with rural services.

* * *

*Costs of Earned Revenues.* Costs of earned revenues decreased to $1.141 billion, or 80.9% of contract revenues, during the six months ended January 27, 2018, compared to $1.176 billion, or 78.4% of contract revenues, during the six months ended January 28, 2017. The primary components of the decrease were a $34.0 million aggregate decrease in direct labor and subcontractor costs and a $14.1 million decrease in direct material costs, primarily due to a lower level of operations. Partially offsetting these decreases, equipment maintenance and fuel costs combined increased $4.8 million and other direct costs increased $8.4 million.

Costs of earned revenues as a percentage of contract revenues increased 2.5% during the six months ended January 27, 2018, compared to the six months ended January 28, 2017. As a percentage of contract revenues, labor and subcontracted labor costs increased 1.3% during the six months ended January 27, 2018. The increase in labor and subcontracted labor costs as a percentage of contract revenues primarily resulted from costs incurred as the scale of our operations expanded and from widespread adverse weather which reduced the number of available workdays and negatively impacted productivity and margins during the fiscal quarter ended January 27, 2018. Equipment maintenance and fuel costs combined increased 0.6% as a percentage of contract revenues from under absorption of equipment costs and increased fuel costs relative to the mix of work. Additionally, direct material costs and other direct costs increased 0.5% as a percentage of contract revenues, on a combined basis, reflecting lower operating leverage and the impact of costs associated with the initiation of customer programs, including permitting costs.

116. Regarding backlog, the Transition Report stated:

Our backlog consists of the estimated uncompleted portion of services to be performed under contractual agreements with our customers and totaled $5.847 billion, $6.016 billion and $6.031 billion at January 27, 2018, July 29, 2017, and July 30, 2016, respectively. We expect to complete 52.1% of the January 27, 2018 total backlog during the next twelve months.

117. On March 6, 2018, the Director Defendants caused Dycom to issue yet another investor presentation again concealing the true causes of the reduced expectations:



**Looking Ahead to the Quarter Ended April 28, 2018 (Q1-2019)**

*Financial table- $ in millions, except earnings per share amounts (% as a percent of contract revenues, except as noted for Effective Income Tax Rate)*

| Q1-19 Outlook | Quarter Ended April 29, 2017 | Outlook - Quarter Ended April 28, 2018 (Q1-2019) |
|---|---|---|
| Contract Revenues | $ 786.3 | $ 720 - $ 750 |
| Diluted Earnings per Common Share – GAAP | $ 1.22 | $ 0.52 - $ 0.67 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $ 1.30 | $ 0.63 - $ 0.78 |
| Non-GAAP Adjusted EBITDA % | 13.8% | 10.7% -11.1% |

| Other Expectations | Quarter Ended April 29, 2017 | Outlook - Quarter Ended April 28, 2018 (Q1-2019) |
|---|---|---|
| Depreciation | $ 31.2 | $ 37.9 - $ 38.7 |
| Amortization | $ 6.2 | $ 5.5 |
| Share-based compensation (Amount is included in General & Administrative Expense) | $ 4.9 | $ 5.3 |
| Non-GAAP Adjusted Interest Expense (Excludes non-cash amortization of debt discount of $4.4 million for the Quarter Ended April 29, 2017 and expectations of $4.7 million in Q1-19) | $ 5.0 | $ 5.4 |
| Other Income, net (Includes Gain on sales of fixed assets of $5.0 million for the Quarter Ended April 29, 2017 and expectation of $4.8 - $5.4 million in Q1-19) | $ 4.8 | $ 4.1 - $ 4.7 |
| Non-GAAP Adjusted Effective Income Tax Rate (as a % of Adjusted Non-GAAP Income before Taxes) | 37.0% | 27.0 % - 27.5 % |
| Adjusted Diluted Shares – Non-GAAP | 31.9 million | 31.8 million |

❖ Revenue outlook for Q1-2019 reflects our expectations of the following:
  ➢ Accelerating fiber deployments for emerging wireless technologies
  ➢ Wireless services begin to ramp
  ➢ Solid demand from several large customers reflecting 1 gigabit deployments and fiber deep cable capacity projects

❖ Margin outlook for Q1-2019 reflects anticipated timing of activity on large customer programs and the related impacts on margins as well as near-term weather impacts

*See "Regulation G Disclosure" slides 29-36 for a reconciliation of GAAP to Non-GAAP financial measures.*

28

### THE TRUTH BEGINS TO EMERGE

118.    On May 22, 2018, Dycom announced its first quarter 2019 financial results for the period ended April 28, 2018 and revised its the guidance for fiscal 2019.  The Company stated, in relevant part:

Outlook

The Company is revising its financial guidance for the 2019 fiscal year ending January 26, 2019 to reflect the actual results for the quarter ended April 28, 2018 and the anticipated timing of activity on large customer programs and the related impacts on revenues and margins. The Company's previous guidance and its current expectations for fiscal 2019 are as follows:

119.    The same day, the Company held a conference call to discuss the financial results.

During the call, defendant DeFerrari, stated in relevant part:

> Adjusted EBITDA was $73.7 million in Q1 2019, which was at 10.1% of revenue. Gross margins were at 18% and compared to the April quarter last year were impacted by prolonged winter weather conditions and costs incurred on large customer programs.
>
> Gross margins were approximately 100 basis points below our expectations for the quarter. ***This margin pressure resulted from the under-absorption of labor and field costs as large customer programs mobilized. We expect margins to continue to be impacted in the near term with the pressure dissipating as we gain greater momentum on these large programs***. Accordingly, our outlook has been lowered for the full fiscal year from our prior expectations to reflect the expected margin pressure.

120.    Analysts were focused on the disappointing margins, as one stated "***the big question on everyone's mind this morning is the pressure on margin and a little more specifics around what's causing it.***"  Defendant Nielsen stated, in relevant part:

> So, to the second question, Matt, yes. I mean, we have not changed our view on mid-teens EBITDA. With respect to the pressure on the business, we have a number of large programs, some of which require extensive permitting and other governmental authorities. While we've been through this before, the timing of when you build up a cadence in that process that will allow you to efficiently deploy resources, it's hard to forecast. I mean, we understand that and we're disappointed that we didn't get it as right as we would have liked last quarter. But that doesn't change that the projects are there, that we're confident in our ability to execute. ***We've just got to get enough work in hand so that we can both absorb the fixed cost around warehousing and supervision and general management as well as be efficient in the field as we get more permitted backlog that we can really go to work on***. And it's getting better every day. It's just not getting better as quickly as we would have hoped 91 days ago.

121.    An analyst clarified: "is this customer shifting the timing of work or is it simply the permitting process?"  Defendant Nielsen responded

> We're all working together with our customers, with the permitting authorities. These are large programs. In fact, I think they are substantial programs and that means there is a substantial buildup in activities from the permitting authorities and it's taking a little time, but it's getting better.

122.    During the call, defendant Nielsen further disclosed full knowledge of these uncertainties, stating that he would "not comment specifically," but that there had been "some permitting issues."  Nielsen further conceded that he was aware of the permitting issues because they were "always around starting the process."  Nielsen added that the Company "had similar experiences with large programs 15 years ago" and was "still at them."

123.    On this news, Dycom's stock price fell $23.56, or over 20%, to close at $92.64 per share on May 22, 2018, on unusually heavy trading volume.

124.    Notwithstanding their partial disclosure of the truth, the Director Defendants continued to conceal the true extent of Dycom's problems.  For example, during the May 22, 2018 investor call, defendant DeFerrari characterized the Company as "well-positioned," and misleadingly stated that Dycom: (i) was "engaged on a broad range of large customer programs, which are expected to drive meaningful growth in the back half of the fiscal year"; and (ii) expected "accelerating fiber deployments for emerging wireless technologies, increasing wireless services and solid demand from several large customers, reflecting 1 gigabit deployments and fiber deep cable capacity projects."  DeFerrari concluded that, based on the foregoing misrepresentations, the "pressure dissipates as the year goes on."

125.    Confirming DeFerrari's false depiction of Dycom's business, Nielsen then chimed-in that "we see that [margin] softness abating in the second half of the fiscal year," and that major customers' multi-year capital spending initiatives were "increasing in number across multiple customers."

126.    On August 13, 2018, before the market opened, Dycom announced preliminary revenue and results for second quarter 2019, which fell below previous guidance:

DYCOM INDUSTRIES, INC. LOWERS EXPECTATIONS FOR FISCAL 2019 SECOND QUARTER RESULTS AND GUIDANCE FOR THE FULL FISCAL YEAR, AND PROVIDES GUIDANCE FOR THE NEXT FISCAL QUARTER

Palm Beach Gardens, Florida, August 13, 2018 - Dycom Industries, Inc. (NYSE: DY) announced today that revenues and results for the quarter ended July 28, 2018 will be below previous guidance. The Company's previous guidance and its preliminary results are as follows"

| | Previous Guidance Quarter Ended July 28, 2018* | Preliminary Results Quarter Ended July 28, 2018 (a)(b) |
|---|---|---|
| Contract revenues | $830 - $860 million | $799.5 million |
| Diluted Earnings per Common Share - GAAP | $1.02 - $1.17 | $0.94 - $0.97 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $1.13 - $1.28 | $1.05 - $1.08 |
| Non-GAAP Adjusted EBITDA % of contract revenues | 12.4% - 12.8% | 12.0% - 12.2% |

\* \* \*

| | Previous Guidance Fiscal 2019* | Revised Guidance Fiscal 2019 (a) |
|---|---|---|
| Contract revenues | $3.23 - $3.43 billion | $3.01 - $3.11 billion |
| Diluted Earnings per Common Share - GAAP | $3.81 - $4.70 | $2.17 - $2.62 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $4.26 - $5.15 | $2.62 - $3.07 |
| Non-GAAP Adjusted EBITDA % of contract revenues | 12.4% - 12.9% | 10.7% - 11.1% |

127.    During a conference call that day, defendant Nielsen elaborated:

This morning, we reported preliminary results for the second quarter that were below our prior expectations. Revenue is expected to be approximately $799.5 million with Adjusted Diluted Earnings per Share, expected to range from a $1.05 to $1.08. This range includes approximately $0.9 million of incremental tax benefits. ***These preliminary results were impacted by large scale deployments that were slower than expected during the quarter, due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs to the lower revenue level***.

(Emphasis added.)

128.    Defendant Nielsen disclosed that Dycom's core business was not as busy as previously reported and that large projects were not ramping up as expected due to uncertainties related to permitting issues.  Specifically, during the call, analysts questioned the permitting:

Analyst: Steve, your comment with regards to tactical considerations primarily permitting, can you expand upon that just a little bit as it relates to how this

tactical consideration due to permitting maybe is different than maybe past FiOS builds or fiber builds in the mid-2000s?

Nielsen: Yeah, I think Alex as we said in May, these are big programs, they're ramping up broadly, *they're subject to greater uncertainties and those are the uncertainties that impacted the second quarter*. I mean they will resolve, but there are uncertainties because of the size of the programs.

Analyst: And then as it relates to cost pressures in the short-term, can you expand upon that a little bit too? And maybe address sort of your thinking on head count in the short-term, do you carry head count in anticipation of the big backlog and how that could come through next year? Just a little bit more detail would be helpful?

Nielsen: Sure. So, I think as we said in the comments, it's really an absorption question. *I mean we have to have the staff in place to support the revenue that's embedded in the guidance and we do, but we're not as busy as we had expected to be and so that created an absorption question*. But because the work is there we have to have the people.

(Emphasis added.)

129.    On this news, Dycom's stock price fell $21.62 per share, or over 24%, to close at $68.09 per share on August 13, 2018, on unusually heavy trading volume.

## THE DIRECTOR DEFENDANTS ISSUE A MISLEADING PROXY STATEMENT

130.    On October 12, 2017, defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Thomsen, Coe and Coley issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held November 21, 2017.   In the proxy statement, these eight Director Defendants solicited stockholder votes in favor of six management proposals, including: (i) a proposal to elect Duke and Thomsen to new terms as directors; (ii) a proposal to approve an amendment to the 2012 Long-Term Incentive Plan (the "2012 Plan"); and (iii) a proposal to approve the Company's 2017 Non-Employee Directors Equity Plan (the "2017 Directors Plan").

131.   The proxy statement disclosed that the Board had determined that defendant Nielsen was not independent.  Regarding corporate governance and risk oversight, the proxy statement stated:

> The Board of Directors takes an active role in overseeing risks related to the Company both as the full Board of Directors and through its committees. The committees of the Board of Directors are primarily responsible for the oversight of risk as follows:
>
> - the Audit Committee has oversight over the financial reporting, accounting and internal control risks;
>
> - the Compensation Committee oversees the Company's executive compensation arrangements, including the identification and management of risks that may arise from the Company's compensation policies and practices (see page 25 of this Proxy Statement for a more detailed discussion);
>
> - the Corporate Governance Committee has oversight over corporate governance, including establishing practices and procedures that promote good governance and mitigate governance risk, and is also responsible for reviewing the performance of the Board of Directors and individual directors. The Corporate Governance Committee also ensures that each committee of the Board of Directors engages in an annual performance self-evaluation based upon criteria and processes established by the Corporate Governance Committee; and
>
> - the Finance Committee has oversight over liquidity, credit and interest rate risks, and acquisition and disposition plans.

132.   Regarding officer compensation, the proxy statement told stockholders that Nielsen received $4,383,269 and DeFerrari received $1,670,118 in executive compensation for fiscal 2017.

133.   In addition to this executive compensation, the 2012 Plan authorizes the issuance of shares of Dycom's stock for equity awards to employees and officers.  As of October 2, 2017, 434,921 shares were available for future grant.   The proxy statement solicited shareholder approval to increase the number of shares available for issuance under the 2012 Plan by 865,000. If approved, the total number of shares reserved for issuance would be 1,299,921.

134.     Regarding non-employee director compensation, the proxy statement told stockholders that each of Coe, Coley, Duke, Gertel, Gustafsson, Higgins, and Thomsen received compensation from Dycom for their service on the Board during fiscal 2017 ranging between $199,038 and $229,285.   In addition to this excessive compensation, the 2007 Non-Employee Directors Equity Plan (the "2007 Plan") authorizes the issuance of shares of the Company's common stock to Dycom's non-employee directors.   As of October 2, 2017, 112,576 shares were available for future grant.   The 2007 Plan was scheduled to expire on November 20, 2017 in accordance with its terms.

135.     The proxy statement solicited shareholder approval of the 2017 Directors Plan to replace the 2007 Plan.   According to the proxy statement, the 2017 Directors Plan is administered by the Board or a committee of non-employee directors.   If approved, the total number of shares reserved for issuance under the 2017 Directors Plan would be 140,000. Moreover, equity pursuant to the 2017 Directors Plan is effectively awarded at the discretion of the Board:

> ***Administration.*** The 2017 Directors Plan is administered by the Board of Directors or any committee designated by the Board of Directors (for purposes of this proposal, the Board of Directors or such committee being referred to herein as the "Administrator"). Subject to the terms of the 2017 Directors Plan, the Administrator will have discretionary authority to determine the terms and conditions of awards made under the 2017 Directors Plan. Additionally, the Administrator may, without limitation, make factual and legal determinations in connection with the administration or interpretation of the 2017 Directors Plan. All decisions and determinations by the Administrator are final and binding on all parties.

136.     The proxy statement as materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of

discretionary compensation.  A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

137.    On November 22, 2017, the Company filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement.  In particular: (i) defendants Duke and Thomsen were reelected to terms as directors; (ii) the amendment to the 2012 Plan was approved; and (iii) the 2017 Directors Plan was approved.  The reelection of these two directors and approval of the 2012 Plan and the 2017 Directors Plan based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties.

## REPURCHASES OF COMPANY STOCK DURING THE RELEVANT PERIOD

138.    During the Relevant Period, the Director Defendants caused the Company to repurchase its common stock which substantially damaged the Company.

139.    The Company repurchased 200,000 shares of its common stock, at an average price of $84.38 per share, for $16.9 million for the six months ended January 27, 2018.

## LOSS CAUSATION

140.    During the Relevant Period, the Director Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities and operated as a fraud or deceit on Relevant Period purchasers of the Company's securities by failing to disclose and misrepresenting the adverse facts and risks detailed herein. Later, when the Director Defendants prior misrepresentations and fraudulent course of conduct, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to the market, the price of the Company's securities declined significantly as the prior artificial inflation was released from the Company's share price.

141.    As a result of the Company's purchases of the Company's securities during the Relevant Period, the Company suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements, half-truths, and omissions had the intended effect and caused the Company's securities to trade at artificially inflated levels throughout the Relevant Period.

142.    By concealing from the Company the adverse facts, the Director Defendants presented a misleading picture of the Company's business and prospects.  When the information and/or underlying conditions, and/or effects thereof were revealed to the market through corrective disclosure and/or a materialization of the concealed risk, the price of the Company's securities fell dramatically.  This decline removed the artificial inflation from the price of the Company's securities, causing economic loss to the Company who had purchased its securities during the Relevant Period.

143.    The decline in the price of the Company's securities following the corrective disclosure and/or materialization of the concealed risk was a direct result of the nature and extent of the Director Defendants' fraudulent misrepresentations, half-truths, and omissions being revealed to the market.  The timing and magnitude of the price declines in the Company's securities, the Director Defendants' post-Relevant Period revelations, and analyst reactions to the news, negate any inference that the loss suffered by the Company was caused by changed market conditions, macroeconomic or industry factors, unrelated to the Director Defendants' fraudulent conduct.

144.    The economic loss, *i.e.*, damages, suffered by the Company was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of the Company's securities and the subsequent material decline in the value of the Company's

securities when the Director Defendants' prior misrepresentations, misleading omissions and half-truths, and other fraudulent conduct were revealed.

## APPLICATION OF PRESUMPTION OF RELIANCE

145.    The Company is entitled to a presumption of reliance on the Director Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a)    The Company's securities were actively traded on the NYSE throughout the Relevant Period;

(b)    The Company's securities traded at high weekly volumes during the Relevant Period;

(c)    The Director Defendants filed periodic public reports with the SEC;

(d)    The Director Defendants regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e)    The market reacted promptly to public information disseminated by the Director Defendants;

(f)    The Company's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.   Each of these reports was publicly available and entered the public marketplace;

(g)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h)     without knowledge of the misrepresented or omitted material facts alleged herein, the Company purchased shares of the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were revealed.

146.    In the alternative, the Company is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Directors Defendants are primarily predicated upon omissions of material facts which there was a duty to disclose.

## **NO SAFE HARBOR**

147.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

148.    First, the Director Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor.  Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objective.  To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

149.    Second, any purported forward-looking statements were not accompanied by meaningful cautionary language because any risks that the Director Defendants warned of had

already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  Additionally, to the extent the Director Defendants included any cautionary language, such language was not meaningful because any potential risks identified by the Director Defendants had already manifested.  To the extent the Director Defendants included any cautionary language, it was not precise, not meaningful, and did not relate directly to any forward-looking statements at issue.  The cautionary language was boilerplate and did not meaningfully change during the Relevant Period, despite the fact that conditions had materially changed.

150.    Third, to the extent that there were any forward-looking statements that were identified as such, the Director Defendants are liable because, at the time each of those forward-looking statements were made, the speaker knew the statement was false when made.

## DAMAGES TO THE COMPANY

151.    As a direct and proximate result of the Director Defendants' conduct, the Company has lost and expended, and will lose and expend, many millions of dollars.

152.    Such expenditures include, but are not limited to, legal fees associated with the defense of the Securities Class Action filed against the Company and certain of its current and former officers, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

153.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Director Defendants who breached their fiduciary duties to the Company.

154.    Such losses include the Company's overpayment for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

155.    As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Director Defendants' misrepresentations and breaches of fiduciary duties and unjust enrichment.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

156.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

157.    Plaintiffs will adequately and fairly represent the interests of Dycom in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

158.    Plaintiffs are current owners of the Company stock and have continuously been owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

159.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants (except Defendant Pruitt, who joined the Board in November 2018).  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

160.    The Company Board is currently comprised of nine (9) members – Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, Pruitt, Sykes, and Thomsen.  Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent

objective judgment about whether to bring this action or whether to vigorously prosecute this action.

161.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

162.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made, and are excused from making, a pre-suit demand on the Board to initiate this action because making a demand would be a futile and useless act.

163.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

164.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

165.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Director Defendants Are Not Independent or Disinterested**

**Defendant Nielsen**

166.    Defendant Nielsen is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all his income from his employment with Dycom, making him not independent.  Due to his employment as president and CEO of Dycom, defendant Nielsen is not independent under the Company's independence guidelines or under NYSE listing rules.

167.    Below is a chart of Defendant Nielsen's income and compensation from 2016 through 2019:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2019 | $1,000,000 | $ -- | $1,416,787 | $986,135 | $467,212 | $3,815 | $3,873,949 |
| Transition Period | $500,000 | $ -- | $6,99,367 | $504,679 | $578,313 | $2,257 | $2,284,616 |
| 2017 | $946,400 | $ -- | $1,231,850 | $913,173 | $1,286,404 | $5,442 | $4,383,369 |
| 2016 | $910,000 | $ -- | $1,139,740 | $1,003,198 | $1,774,500 | $6,942 | $4,834,380 |

168.    As such, Defendant Nielsen cannot independently consider any demand to sue himself for breaching his fiduciary duties to Dycom, because that would expose him to liability and threaten his livelihood.

169.    Moreover, as CEO and as alleged herein, Nielsen knew that uncertainties with permitting posed near-term margin pressure and absorption issues for Dycom.  Defendant Nielsen personally issued the misleading statements alleged herein. Due to his statements made above, Nielsen is a defendant in the Securities Class Action and his motion to dismiss the securities fraud claims against him was denied. As a result, Defendant Nielsen would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

170.    As detailed herein, Defendant Nielsen knew that Dycom was losing revenue hand over fist and experiencing significant pressure on operating margins as a result of project delays

and cancellations throughout the Relevant Period because each subsidiary provided Defendant Nielsen with a daily report of its operations ("Dailies"), which Defendant Nielsen accessed directly on his computer, that informed him of the progress of each project, the amount of installation completed, billable line items, and which jobs were active.

171.    Defendant Nielsen also received and could directly access on his computer an additional report regarding any Verizon projects through the Verizon Tracking System ("VTS"), a program that every subsidiary used.  The VTS contained project completion dates for fielding and engineering, and payments, which showed that, throughout the Relevant Period, Dycom was experiencing significant project delays, delayed revenue recognition, and cancelled contracts, among other metrics.  Not only did Defendant Nielsen have direct access to each of these programs, but confidential sources confirm (as discussed above) that each subsidiary would also directly send Dycom daily reports from these internal programs.

172.    Defendant Nielsen, as noted above, was further aware of project delays and cancellations through monthly calls that he held with the president of each of Dycom's subsidiaries.  During these calls, permit issues and the loss of contracts were explicitly discussed, among other updates concerning Dycom's customer contracts.

173.    Despite full knowledge of Dycom's permit and project delays and lost revenue, Defendant Nielsen downplayed the delays as typical delays by the permitting authorities claiming they were nothing more than routine because with "large programs" it "always takes the permitting authorities a little bit of time to gear up." Defendant Nielsen also consistently assured the market that "[w]e were not experiencing any material project delays" and Dycom was "actively working on a number of converged wireless/wireline multi-use networks" and that fiber deployments were "accelerating."

174.    Also, despite the fact that Dycom's top revenue-generating customers were cancelling and withholding future contracts from Dycom as a result of Dycom's delays and insufficient staffing, Defendant Nielsen nevertheless omitted this information and represented instead that it had "[s]olid demand from several large customers," and "maintained strong customer relationships throughout our markets. We continue to win and extend contracts at attractive pricing."

**Defendants Coley, Gertel, Higgins, and Thomsen**

175.    During the Relevant Period, Defendants Coley, Gertel, Higgins, and Thomsen served as members of the Audit Committee.   Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing Dycom's financial statements, Management's Discussion and Analysis, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

176.    Defendants Coley, Gertel, Higgins, and Thomsen breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.   Therefore, Defendants Coley, Gertel, Higgins, and Thomsen face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

177.    This Court held in the Securities Class Action:

Of the sixty statements identified by Plaintiffs, Defendants argue twenty-four fall into one of these two safe-harbor exceptions. *See* Ex. A to Mot. to Dismiss (DE [74-1]).  Examples include:

• "Engineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018." SAC ¶ 227.

• "We don't have any major programs coming to an end. Generally, they're going to accelerate through the year." *Id.* ¶ 233.

Of course, these are just two of two dozen examples. In total, the Court counts over ten statements where Defendants began with the words "we expect" or "we anticipate." *See* Ex. A to Mot. to Dismiss (DE [74-1]). Based on this, and upon a thorough review of the statements, the Court finds they are forward-looking and presumptively covered by the safe harbor. The statements discuss Dycom's "plans, expectations, and optimism." *In re Noven*, 238 F. Supp. 2d at 1320.

However, the analysis cannot end there. Under the safe-harbor provision of the PSLRA, a forward-looking statement is not actionable only if:

(A)    the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or . . . .

(B)    the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading . . . .

15 U.S.C. § 78u-5(c)(1)(A), (B). For clarity, the Court will refer to the first exception as the "cautionary statement exception" and the second exception as the "actual knowledge exception."[] The Court finds Plaintiffs' allegations of Defendants' forward-looking statements overcome both of these exceptions.

Under the cautionary statement exception, "meaningful cautionary language must be more than mere boilerplate language." In re Columbia Labs., 144 F. Supp. 2d at 1368– 69. While Plaintiffs contend "Defendants' statements were not accompanied by *meaningful* cautionary language," Resp. in Opp'n to Mot. to Dismiss 15 (DE [76]) (emphasis added), the Court concludes the statements actually came with no cautionary language whatsoever, much less meaningful cautionary language. Even under what the Court considers a hyper-liberal interpretation of Defendants' statements, supplements like "the permitting process experience 'normal timing volatility,'" see id., are not cautionary language. Neither is a proviso "that customer contracts could be canceled 'for any reason.'" *Id.*

The Court finds Plaintiffs have satisfied the standard for the actual knowledge exception, as well. The allegations of false and misleading statements that pervade the Second Amended Complaint are buttressed by allegations that CEO and CFO knew they were false. *See, e.g.*, SAC ¶¶ 23, 24, 136–88, 323. Accepted

as true for this motion to dismiss, the Court finds these allegations more than sufficient to withstand dismissal.

178.    Defendants Coley, Gertel, Higgins, and Thomsen had oversight over the financial reporting, accounting and internal control risks of the Company.

179.    According to the Company's Audit Committee Charter: "The Committee shall review the Company's policies with respect to risk assessment and risk management with the Vice President of Internal Audit."

180.    According to the Securities Class Action, CW9 was formerly the Vice President of Internal Audit at Dycom from November 2007 until December 2017.  CW9 also reported to the Audit Committee.

181.    As noted above, CW9, Dycom's former Vice President of Internal Audit from November 2007 to December 2017, who reported directly to Defendants DeFerrari, stated that Defendant Nielsen held monthly calls with the president of each subsidiary and Chief Operating Officer Estes. Upon information and belief, as noted above, CW9 stated that the monthly calls focused on a number of topics, including any significant changes that occurred in the past thirty days such as lost customer contracts and permitting issues, in addition to a number of other topics such as finances, collecting money owed to the subsidiaries, and how certain jobs were progressing.  Certain of the calls could include more than one subsidiary; CW9 stated that there were 20 to 25 calls a month to cover the roughly 40 subsidiaries, and that each call last about 30 minutes.  This is corroborated by Dycom's SEC filings which confirm that the Company itself organizes its various segments.

182.    As having oversight over the financial reporting, accounting and internal control risks of the Company, Defendants Coley, Gertel, Higgins, and Thomsen must have been aware

that the Company was missing project initiation and completion deadlines, resulting in a significant loss of revenue.

**Defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen**

183.    Defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen each signed the Transition Report and caused it to be filed.  Additionally, defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen in September 2017 acted to authorize the Company to transition to a new fiscal year, which directly led the Company to issue the Transition Report.  As set forth herein, the Transition Report contained misleading statements, including: ""[w]e were not experiencing any material project delays or other circumstances that would impact the realizability of the CIEB balance as of January 27, 2018 or July 29, 2017."

184.    The misrepresentations included in the Transition Report, as well as the other misleading statements alleged herein, relate to Dycom's core business.  The reasonable inference is that defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen were aware of material trends affecting Dycom's core business, particularly the pervasively negative ones alleged above.

185.    Notwithstanding their knowledge of concealed negative trends affecting Dycom's business, defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen signed and caused the Company to file the Transition Report which falsely asserted that the Company was not experiencing any material project delays.  Having already subjected the Company to significant harm due to the misleading statements contained in documents they personally signed, defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen cannot disinterestedly investigate their own decisions to issue those misleading statements.  As a result,

demand is excused as to defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen in connection with counts I, II, and III.

186.    Defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen also caused the Company to issue the misleading 2017 proxy statement.  Indeed, the first page of the 2017 proxy statement avers that the document was issued "By Order of the Board of Directors." The proxy statement solicited and obtained shareholder votes to, among other things, approve compensation payable to defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen.  In the proxy statement, defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen affirmatively recommended that shareholders vote "for" approval of the 2017 Non-Employee Directors Equity Plan.

187.    These defendants thus sought and obtained shareholder approval of compensation payable directly to them while they were concealing material negative information regarding Dycom's business.  Defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen could not disinterestedly investigate a demand for action in connection with the misleading proxy statement because they personally benefitted from the shareholder approval of the 2017 Non-Employee Directors Equity Plan which would not have been approved were the truth publicly known.  Indeed, according to the Company's 2020 proxy statement, "as of January 25, 2020, the Company had 94,217 shares available for future awards under the plan," meaning that due to their issuance of the misleading 2017 proxy statement, defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen and others received approximately *50,000* shares of Dycom stock that they could not have received but for their issuance of the misleading proxy statement.

188.     For these reasons, defendants Coley, Duke, Gertel, Gustafsson, Higgins, Nielsen, and Thomsen would be interested in a demand regarding the 2017 proxy statement and demand is excused on that basis.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

189.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

190.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

191.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

192.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

193.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

194.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

image and goodwill.  Such damage includes, among other things, costs associated with defending the Securities Class Action, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

195.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

196.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

197.   As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

198.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

199.   Plaintiffs, on behalf of Dycom, have no adequate remedy at law.

## COUNT III

### (Against the Director Defendants for Violations of Section 10(b)
### of the Exchange Act and SEC Rule 10b-5)

200.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

201.     During the Relevant Period, the Director Defendants disseminated or approved public statements that misrepresented or failed to disclose that (a) Dycom's large projects were highly dependent on permitting and logistical considerations; (b) Dycom was facing great uncertainties related to permitting issues; and (c) said uncertainties would expose Dycom to near-term margin pressure and absorption issues. Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

202.     As such, the Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

203.     As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, and in addition, overpaid for its own stock which the Director Defendants caused the Company to repurchase.

**COUNT IV**

**(Against Defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Thomsen, Coe and Coley for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9)**

204.     Plaintiffs incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

205.     On October 12, 2017, Defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Thomsen, Coe and Coley issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held November 21, 2017. In the proxy

statement, these eight Director Defendants solicited stockholder votes in favor of six management proposals, including: (i) a proposal to elect Duke and Thomsen to new terms as directors; (ii) a proposal to approve an amendment to the 2012 Long-Term Incentive Plan (the "2012 Plan"); and (iii) a proposal to approve the Company's 2017 Non-Employee Directors Equity Plan (the "2017 Directors Plan").

206.    The proxy statement disclosed that the Board had determined that defendant Nielsen was not independent. Regarding corporate governance and risk oversight, the proxy statement stated:

> The Board of Directors takes an active role in overseeing risks related to the Company both as the full Board of Directors and through its committees. The committees of the Board of Directors are primarily responsible for the oversight of risk as follows:
>
> • the Audit Committee has oversight over the financial reporting, accounting and internal control risks;
>
> • the Compensation Committee oversees the Company's executive compensation arrangements, including the identification and management of risks that may arise from the Company's compensation policies and practices (see page 25 of this Proxy Statement for a more detailed discussion);
>
> • the Corporate Governance Committee has oversight over corporate governance, including establishing practices and procedures that promote good governance and mitigate governance risk, and is also responsible for reviewing the performance of the Board of Directors and individual directors. The Corporate Governance Committee also ensures that each committee of the Board of Directors engages in an annual performance self-evaluation based upon criteria and processes established by the Corporate Governance Committee; and
>
> • the Finance Committee has oversight over liquidity, credit and interest rate risks, and acquisition and disposition plans.

207.    Regarding officer compensation, the proxy statement told stockholders that Nielsen received $4,383,269 and DeFerrari received $1,670,118 in executive compensation for fiscal 2017.

208.    In addition to this executive compensation, the 2012 Plan authorizes the issuance of shares of Dycom's stock for equity awards to employees and officers. As of October 2, 2017, 434,921 shares were available for future grant. The proxy statement solicited shareholder approval to increase the number of shares available for issuance under the 2012 Plan by 865,000. If approved, the total number of shares reserved for issuance would be 1,299,921.

209.    Regarding non-employee director compensation, the proxy statement told stockholders that each of Coe, Coley, Duke, Gertel, Gustafsson, Higgins, and Thomsen received compensation from Dycom for their service on the Board during fiscal 2017 ranging between $199,038 and $229,285. In addition to this excessive compensation, the 2007 Non-Employee Directors Equity Plan (the "2007 Plan") authorizes the issuance of shares of the Company's common stock to Dycom's non-employee directors. As of October 2, 2017, 112,576 shares were available for future grant. The 2007 Plan was scheduled to expire on November 20, 2017 in accordance with its terms.

210.    The proxy statement solicited shareholder approval of the 2017 Directors Plan to replace the 2007 Plan. According to the proxy statement, the 2017 Directors Plan is administered by the Board or a committee of non-employee directors. If approved, the total number of shares reserved for issuance under the 2017 Directors Plan would be 140,000. Moreover, equity pursuant to the 2017 Directors Plan is effectively awarded at the discretion of the Board:

> Administration. The 2017 Directors Plan is administered by the Board of Directors or any committee designated by the Board of Directors (for purposes of this proposal, the Board of Directors or such committee being referred to herein as the "Administrator"). Subject to the terms of the 2017 Directors Plan, the

Administrator will have discretionary authority to determine the terms and conditions of awards made under the 2017 Directors Plan. Additionally, the Administrator may, without limitation, make factual and legal determinations in connection with the administration or interpretation of the 2017 Directors Plan. All decisions and determinations by the Administrator are final and binding on all parties.

211.   The proxy statement was materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

212.   On November 22, 2017, the Company filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement. In particular: (i) defendants Duke and Thomsen were reelected to terms as directors; (ii) the amendment to the 2012 Plan was approved; and (iii) the 2017 Directors Plan was approved. The reelection of these two directors and approval of the 2012 Plan and the 2017 Directors Plan based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties.

213.   SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.  Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose (a) Dycom's large projects were highly dependent

on permitting and logistical considerations, (b) Dycom was facing great uncertainties related to permitting issues; (c) said uncertainties would expose Dycom to near-term margin pressure and absorption issues.; and (d) that as a result, the Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Relevant Period.

214.    In the exercise of reasonable care, Defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Thomsen, Coe and Coley should have known that the statements contained in the Proxy were materially false and misleading.

215.    The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.  The Proxy was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

216.    The Company was damaged as a result of Defendants Nielsen, Duke, Gertel, Gustafsson, Higgins, Thomsen, Coe and Coley's material misrepresentations and omissions in the Proxy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A)    Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

(B)    Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing the Director Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating

procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)     Awarding such other and further relief as is just and equitable.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 16, 2020

**LAW OFFICES OF SCOTT EGLESTON, P.A.**

By: */s/ Scott D. Egleston*
    Scott D. Egleston
152 N.E.167th Street, Suite 300
Miami, Florida 33162
Telephone: (305) 892-8088
Facsimile: (305) 675-3730
Email: scott@eglestonlegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

            -and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

*Attorneys for Plaintiffs*